STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

05-700

NATHAN WRIGHT

VERSUS

CYPRESS GENERAL CONTRACTORS, INC.

**********
APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 3
PARISH OF CALCASIEU, NO. 03-06104
SAM L. LOWERY, WORKERS' COMPENSATION JUDGE
**********

GLENN B. GREMILLION
JUDGE

**********

Court composed of John D. Saunders, Oswald A. Decuir, and Glenn B. Gremillion, Judges.

AFFIRMED AS AMENDED.

Mark Zimmerman
4216 Lake Street
Lake Charles, LA 70605
(337) 474-1644
Counsel for Plaintiff/Appellee:
    Nathan Wright

Christopher R. Philip
P. O. Box 2369
Lafayette, LA 70502-2369
(337) 235-9478
Counsel for Defendant/Appellee:
    Louisiana United Businesses Assoc. Self-Insureds Fund

**Michael J. Taffaro**
**Stemmans & Alley**
**668 S. Foster Drive, Suite 101**
**Baton Rouge, LA 70806**
**(225) 231-1288**
**Counsel for Defendant/Appellant:**
      **Cypress General Contractors, Inc.**

GREMILLION, Judge.

The defendant, Cypress General Contractors, Inc., appeals the judgment of the workers' compensation judge awarding the plaintiff, Nathan Wright, weekly indemnity benefits as a result of a work-related injury and penalties and attorney's fees. For the following reasons, we affirm.

## FACTS

At the heart of this dispute is the confusion caused by the fact that Wright suffered two work-related accidents. Wright was employed as a surveyor by Cypress General, although his job duties entailed more than just surveying. On July 3, 2001, he was in a catch basin attempting to join lengths of pipe when a concrete pipe fell off the trackhoe and hit his left leg. In his accident report, Wright noted that his left knee, ankle, and foot were affected in the incident. On July 9, 2001, Dr. Alan Hinton, an orthopedic surgeon, diagnosed him as suffering a probable superficial peroneal sensory nerve injury in his left leg.

Wright suffered a second accident on March 14, 2002, when his foot slipped as he was dismounting a trackhoe via its bucket. This caused him to hit his right shin on the bucket and land heavily on his left leg. The March 22, 2002 accident report lists the affected areas as his right shin, ankle, and foot. On March 21, 2002, he was treated at the Hunter McGuire Medical Center for cellulitis in his right shin. Thereafter, Dr. Stephen Flood, an orthopedic surgeon, performed an arthroscopic surgery on his left knee on November 18, 2002, to repair a torn meniscus. Dr. Flood now recommends that he undergo further arthroscopic surgery due to a probable retearing of the meniscus. Cypress General refused authorization

1

for this procedure and terminated Wright's weekly indemnity benefits on August 3, 2003.

Wright filed a Disputed Claim for Compensation against Cypress General and its workers' compensation insurer, Bridgefield Casualty Insurance Company, based on the termination of his benefits and their failure to authorize treatment recommended by Dr. Flood. He also sought penalties and attorney's fees based on their arbitrary and capricious termination of his benefits. Wright filed a second Disputed Claim for Compensation against LUBA, Cypress General's workers' compensation carrier at the time of his July 2001 work-related injury. Cypress General denied liability for Wright's injury.

Following a trial on the merits, the workers' compensation judge took the matter under advisement. In oral reasons for judgment, he found that Wright suffered a work-related injury to his left knee as a result of the March 14, 2002 accident, that his average weekly wage was based on an hourly wage of $30 per hour in a forty-hour work week, and that he was entitled to the reinstatement of his indemnity and medical benefits. The workers' compensation judge found that Bridgefield was responsible for Wright's benefits, as the March 14, 2002 accident caused his disability, and he dismissed all claims against LUBA. He further awarded $2000 in penalties and $7000 in attorney's fees based on Cypress General's arbitrary and capricious termination of Wright's benefits. A judgment was rendered in this matter on February 18, 2005. Cypress General has suspensively appealed this finding.

2

## ISSUES

Cypress General raises four assignments of error on appeal. It argues that the workers' compensation judge erred in finding that Wright proved a causal relationship between his left-knee injury and his work-related accident, in finding that his average weekly wage was based on a $30 per hour pay scale, and in awarding penalties and attorney's fees based on its allegedly arbitrary and capricious actions. Additionally, Wright has filed an answer to appeal seeking additional attorney's fees for work performed on appeal.

## WORK-RELATED ACCIDENT

An employee who is injured as a result of a work-related accident will receive compensation benefits from his employer. La.R.S. 23:1031(A).

> A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146 (La.1979); Malone and Johnson, *13 Louisiana Civil Law Treatise, Workers' Compensation*, § 253 (2d Ed.1980). Corroboration of the worker's testimony may be provided by the testimony of fellow workers, spouses or friends. Malone & Johnson, *supra*; *Nelson [v. Roadway Express, Inc.*, 588 So.2d 350 (La.1991)]. Corroboration may also be provided by medical evidence. *West, supra*.

> In determining whether the worker has discharged his or her burden of proof, the trial court should accept as true a witness's uncontradicted testimony, although the witness is a party, absent "circumstances casting suspicion on the reliability of this testimony." *West*, 371 So.2d at 1147; *Holiday v. Borden Chemical*, 508 So.2d 1381, 1383 (La.1987). The trial court's determinations as to whether the worker's testimony is credible and whether the worker has discharged his or her burden of proof are factual determinations not to be disturbed on review unless clearly wrong or absent a showing of manifest error. *Gonzales v. Babco Farms, Inc.*, 535 So.2d 822, 824 (La.App. 2d Cir.), *writ denied*, 536 So.2d 1200 (La.1988) (collecting cases).

3

*Bruno v. Harbert Int'l Inc.*, 593 So.2d 357, 361 (La.1992).

Cypress General argues that the workers' compensation judge erred in finding that Wright suffered a work-related injury to his left knee on March 14, 2002. It further argues that he is not entitled to the presumption that this accident caused his disability since he had suffered three prior left-knee injuries and complained of pain in his knee prior to the accident.

Wright admitted that he was involved in two separate accidents, but testified that his knee injury arose from the March 14, 2002 accident. He stated that the first accident left his left leg bruised and sore from his hip to his foot, but never prevented him from working. This was confirmed by his wife, Christine. He was treated once by Dr. Hinton and diagnosed as suffering from a probable superficial peroneal sensory nerve injury in his left leg. His co-worker, Sam Schexnailder, who witnessed the accident, testified that Wright only complained generally about his leg after this accident, but not his left knee.

Wright testified that the second accident left his right shin badly bruised, scratched, and cut and his left knee very sore. He stated that he was originally concerned about his right shin, which developed cellulitis. Cypress General sent him to Hunter McGuire on March 21, 2002, which diagnosed that condition and then released him for work. Christine stated that he limped, complained of knee pain, and had trouble sleeping after this accident. Schexnailder confirmed that Wright had a harder time getting around the job site following the incident. Gavin Abshire, Cypress General's general manager, admitted that this accident occurred.

4

Wright stated that his knee worsened until he was seen by Dr. Dale Bernauer, an orthopedic surgeon. A May 20, 2002 MRI of the left knee revealed a possible "bucket handle" tear of the meniscus, effusion, and a possible Baker's cyst. Dr. Bernauer referred Wright to his partner, Dr. Flood, who performed arthroscopic surgery on the knee on November 18, 2002. Wright said that he has not worked since his surgery.

Wright admitted to two prior left-knee-injuries. One was a high school football injury, and the other occurred after he fell off of a barge in 1990. He stated that he was examined at Baptist Hospital in Orange, Texas, following this incident and was released to return to work.

Cypress General questioned Wright concerning several medical records introduced into evidence. The Hunter McGuire record lists his chief complaint as right leg pain. A January 8, 2003 record from Proactive Therapy states that he suffered a work-related knee injury in late summer 2001. This record further states that he was treated by Dr. Hinton for a while, before seeking treatment from Dr. Flood. Cypress General further questioned Wright regarding a May 2002 patient history form for Open Air M.R.I., which states that he was experiencing left knee pain the previous nine months. Wright confirmed that this was his statement, but explained that his knee had bothered him from time to time. Cypress General further questioned him concerning an April 14, 2003 report from Dr. James Perry, which states that he injured his left knee on July 3, 2001, when a pipe fell on him. However, Dr. Perry testified that as he saw Wright post-operatively, he did not delve into the etiology of his knee injury.

5

Dr. Flood testified that he initially thought that Wright's injury had resulted from the pipe falling on his knee. He stated that he first learned that Wright was involved in two separate accidents at the May 29, 2003 rehabilitation conference with Angie Benoit, a rehabilitation consultant with Jus-Mar. Benoit summarized the outcome of that meeting in a letter to Dr. Flood:

> The consultant then discussed with you the issue of Mr. Wright's 03/14/02, work related injury to his right tibia. You stated your patient would have no additional restrictions due to this injury. However, you did express confusion regarding Mr. Wright's workers' compensation injury of 03/14/02, to his right tibia, and your current treatment of this claimant's left knee. When you questioned Mr. Wright, who was present for this conference, about his left knee injury, your patient stated his knee was injured during a previous work related accident in July of 2001, when a concrete pipe struck his left leg. Mr. Wright stated that he was evaluated by Dr. Perry, Orthopedic Surgeon, immediately following this accident and was released to dull duty activities.
>
> You reported information regarding a previous work related injury to Mr. Wright's left knee of July 2001 and subsequent treatment by Dr. Perry was not indicated by your patient in his medical history. You therefore requested Mr. Wright provide you with a complete addendum to his medical history as soon as possible, which would be reviewed with him, and dictated into his medical chart by you in his presence. Additionally, you recommended Mr. Wright contact Dr. Perry's office immediately, forwarding all information regarding the treatment of his left knee by this physician to you.

Subsequent to the conference, Dr. Flood testified that he obtained and reviewed Dr. Hinton's medical records, had further discussions with Wright, and reevaluated his records. On October 14, 2003, he noted that Dr. Hinton's July 9, 2001 medical record stated that Wright had suffered a probable superficial peroneal sensory nerve injury of his left leg, but no left knee injury. Based on this report, Dr. Flood felt that Wright injured his knee as a result of the March 14, 2003 accident, rather than aggravated a preexisting problem.

6

On November 14, 2003, Dr. Flood again related Wright's left-knee injury and the need for surgery to the March 14, 2002 accident. Moreover, on December 12, 2003, he testified that he reexamined Wright's patient questionnaire of April 15, 2002, completed by him prior to seeing Dr. Bernauer. Dr. Flood stated that the questionnaire cleared up any confusion as to the cause of Wright's knee injury. In the document, Wright described his accident: "FELL DOWN GETTING OFF EQUIPMENT, PIECE OF CONCRETE PIPE DROPPED ON LEFT LEG." Dr. Flood stated that he initially thought this statement involved one incident. Once he understood that two separate incidents had occurred, he noted this finding on the questionnaire and initialed it. He wrote that the first incident, "FELL DOWN GETTING OFF EQUIPMENT," was the acute problem for which Wright was seeking treatment, and that the second incident, "PIECE OF CONCRETE DROPPED ON LEFT LEG," was a prior problem treated by Dr. Hinton.

Dr. Flood opined that Wright's left-knee injury was caused by the March 14, 2002 accident. He based his opinion on the absence of findings by Dr. Hinton that Wright suffered a knee injury following the July 3, 2001 accident and his own finding of a knee injury subsequent to the March 14, 2002 accident. Although he admitted that the July 3, 2001 accident might have caused some of the problems in Wright's knee, Dr. Flood did not believe that it caused the lateral meniscal tear. He explained that a glancing blow, even by a large object, does not commonly cause such tears. Moreover, he stated that a bucket-handle tear typically results in a swollen knee within two to five hours of its occurrence, as a result of bleeding in the knee, even if it does not cause acute pain.

7

Donna Hill, Bridgefield's claims adjustor, only started administering Wright's file in February 2004; thus, her only knowledge of actions taken prior to that date was based on the records contained in the file. She stated that Wright's indemnity benefits were terminated on August 3, 2003, mainly because his explanation regarding the March 14, 2003 accident kept changing.

Prior to and including the May 29, 2003 rehabilitation conference, Hill testified that Dr. Flood never related Wright's injury to the March 2002 accident. Rather, she said that he related it to the accident where Wright was hit by the concrete pipe. Subsequently, she stated that she reviewed Dr. Flood's reports of October 14, 2003, November 14, 2003, and December 12, 2003, which related Wright's knee injury to the March 14, 2002 accident. She testified that these reports failed to clarify which accident caused Wright's knee injury, as they changed the date of the accident (March 14, 2002, rather than July 3, 2001), and the injury suffered (left knee rather than right shin).

After receiving the reports, she stated that Bridgefield reviewed Wright's file again and noted these inconsistencies along with several others. She pointed to Dr. Perry's report which said that Wright injured his knee after being hit in the leg with a concrete pipe on July 3, 2001. She further noted the Proactive Physical Therapy report which said that Wright suffered a work-related knee injury in late summer 2001, received treatment from Dr. Hinton, underwent surgery by Dr. Flood, and experienced persistent problems up until the surgery. However, despite this confusion, Hill admitted that Bridgefield never sought a clarification from Dr. Flood

8

as to the cause of Wright's left-knee injury nor did it provide him with Dr. Hinton's records so that he could review them.

Benoit testified with regard to the May 29, 2003 rehabilitation conference. She stated that Dr. Flood released Wright from his right tibia injury and agreed that he could perform light to medium duty work as pertaining to his knee injury. While discussing the knee injury, she said that Dr. Flood became confused concerning the workers' compensation injury to Wright's right tibia and his treatment of the left knee. Benoit testified that Wright, who was present at the conference, informed Dr. Flood that he had previously injured his left knee when hit by a concrete pipe. Following the conference, she stated that she was told by Bridgefield to place Wright's file on hold.

After carefully reviewing the record, we find that the workers' compensation judge was presented with overwhelming evidence that Wright suffered a work-related injury to his left knee. Further, there is no dispute that he was employed by Cypress General at the time of his injury. The confusion which arose, and to which Cypress General and Bridgefield have clung, is the fact that the two incidents occurred within eight months of each other, both involved the left knee, and both were recounted by Wright when providing full historical information to medical personnel subsequent to the March 14, 2002 accident. Moreover, we would not be deciding this matter had Cypress General not changed workers' compensation insurers during the interim of the two incidents. Unfortunately for Wright, this union of circumstances put him between the proverbial rock and a hard place, leaving him to fend for himself while pursuing his claim against the two insurers.

9

In reaching his decision, the workers' compensation judge stated:

Now, few if any medical reports and narratives are self-explanatory, but the medical evidence in this case, at first glance and even at first reading, presents something less than an instantaneously clear picture of the claimant's treatment history. But it's not as puzzling as it may appear at first blush. I think, in fact, what happened is that there was an unfortunate confluence involving a claimant who can best be described as somewhat abrupt and terse, and a physician who, for whatever reasons just didn't accurately comprehend what the patient was telling him. This assessment generally is applicable, or at least considered, in matters involving the allegation of fraud; but fraud is not involved here on either side. It's a communication problem, not one of honesty.

I think Mr. Wright injured his left knee seriously enough in the March 14, 2002 (sic) to require surgery and disablement, and that Dr. Flood, while reviewing the medical referral documentation, incorrectly assumed an inappropriate relationship between that accident and the earlier one on July the 3rd, 2001. I can't see how any other reasonable conclusion can be reached other than that, given the language of the medical notes of Dr. Hinton, Dr. Flood, and Dr. Bernauer.

We find that these reasons accurately explain how the alleged confusion and inconsistencies arose in this matter, resulting in Wright's claim. Rather than seeking a clarification from Dr. Flood in order to clear up the matter, Bridgefield terminated Wright's indemnity and medical benefits. This was in direct contradiction of its "continuing duty to investigate, to assemble, and to assess factual information before denying benefits." *Thomas v. Alliance Compressors*, 04-1034, p. 5 (La.App. 3 Cir. 12/8/04), 889 So.2d 424, 428, *writ denied,* 05-0086 (La. 3/18/05), 896 So.2d 1010 (quoting *George v. Guillory*, 00-591, p. 13 (La.App. 3 Cir. 11/2/00), 776 So.2d 1200, 1209)). Dr. Flood described the symptoms arising from a bucket-handle tear of the meniscus. None of these symptoms were exhibited by him after his July 3, 2001 accident, as none were noted by Dr. Hinton six days later. Plus, Dr. Flood stated that landing heavily on the left leg could cause this type of injury, whereas a

10

glancing blow to the leg normally does not result in such a tear. Thus, it was reasonable for the workers' compensation judge to find that in the absence of an intervening accident, Wright's knee injury occurred on March 14, 2002, and that Bridgefield is the covering insurer.

Moreover, we find no error in the workers' compensation judge's award of penalties and attorney's fees. Bridgefield failed to take reasonable steps in determining the exact etiology of Wright's work-related injury after receiving the allegedly confusing information from Dr. Flood. As stated above, this breached their continuing duty to investigate his claim. Accordingly, the award of $2000 in penalties and the $7000 in attorney's fees is affirmed.

### AVERAGE WEEKLY WAGE

In this assignment of error, Cypress General argues that the workers' compensation judge erred in determining Wright's average weekly wage based on a pay scale of $30 per hour rather than the $10 per hour it claimed to pay him for his labor.

Wright, who began working for Cypress General in 1998, testified that in addition to surveying, he also supervised workers, estimated job costs, performed carpentry work, operated heavy equipment, finished cement, and liaised with clients. He stated that Cypress General initially paid him $30 per hour, with overtime pay of $45 per hour. At some point, Wright testified that Cypress General began paying him wages of $10 per hour, along with $20 per hour for the use of his personal van, four-wheeler, and surveying equipment. He said that this was done in order to help Cypress General save money on its workers' compensation coverage and not via an

11

agreement between them. Although he was paid to use his own van, Wright stated that Cypress General paid for its fuel, tires, and upkeep through his company credit card. He testified that his one-second electronic total surveying station cost $6000 brand new and that the only upkeep associated with it was recharging the batteries.

Wright admitted that he received two checks from Cypress General and that taxes were taken out of the $10 per hour check, but not the $20 hour check. In 2001, he earned $24,315, based on his $10 per hour wage, and $48,380, based on the $20 per hour amount. In 2002, he earned $19,720, based on the $10 per hour wage, and $43,040, based on the $20 per hour amount.

Christine agreed with Wright's testimony concerning his initial wages with Cypress General. She stated that his pay later changed to $30 per hour with no overtime, with this amount divided between two checks. She said that Cypress General indicated that it was less complicated for them to pay him in this manner.

Schexnailder testified that he is paid a truck allowance by Cypress General of $100 per week and not an hourly rate of $20 per hour.

Abshire stated that Wright was hired as a surveyor by Cypress General and that his job duties included establishing lines, levels, laying out projects, and interpreting plans. Abshire testified that he was initially paid $30 per hour until an agreement was reached between them to pay him $10 per hour for his labor and $20 per hour for the rental of his van, four-wheeler, trailer, and surveying equipment. He explained that taxes were taken out of the check representing Wright's labor, but not out of the rental check.

12

Abshire stated that Cypress General has never paid a surveyor $30 per hour and explained that Wright was only paid that amount because he used his own equipment. At one point, he stated that Wright wanted Cypress General to purchase new surveying equipment. However, he said that Wright decided to purchase the equipment himself after being told that his payment agreement would be renegotiated if Cypress General owned the surveying equipment.

Subsequent to Wright's accident, Abshire testified that Cypress General purchased its own surveying equipment and hired a surveyor to replace him. He said that the surveyor, Darren Sargeant, is licensed and has a college degree, unlike Wright, and is not paid $30 per hour. However, Abshire admitted that Wright did more than just surveying for Cypress General, such as designing deck forms for bridges.

Sargeant testified that he has been employed by Cypress for one-and-a-half years. He stated that he has a college degree in computer science and has been involved in the surveying industry for fifteen years. He testified that he is a Surveyor In Training, but indicated that he had just sat for his Professional Land Surveyor license. Sargeant testified that he only performs surveying work for Cypress General and that he earns $17.50 per hour. He stated that the industry would not bear paying $30 per hour for a surveyor, but admitted that he would not work for only $10 per hour.

In finding that Wright's average weekly wage was based on $30 per hour rather than $10 per hour, the workers' compensation judge stated:

Disingenuous is the most charitable, certainly not the most accurate, description that can be given to the employer's claim, which he made

repeatedly with a straight face. Unflinching, the employer's representative said that during the two years prior to the disabling accident, he paid more than $40,000 in van and surveying equipment upkeep to keep this $10-an-hour employee. Pressed on cross-examination for a reason of this bifurcation of income, the employer's representative was hard-pressed to explain how this arrangement evolved. It was just done, he said. Unexplained was why the employer's credit card was used to purchase tires and gas for the van and why the claimant here bought his own surveying equipment. Defense counsel did all he could reasonably be expected to do to make some sense out of this tale, but it flies squarely in the face of common sense and customary business practice.

Generally, payments received by an employee for the use of his tools and equipment are not included the calculation of his average weekly wage. *Hood v. C.J. Rogers, Inc.*, 94-1162 (La.App. 3 Cir. 3/8/95), 654 So.2d 371 (citing Wex A. Malone & H. Alston Johnson III, 14 *Louisiana Civil Law Treatise, Workers' Compensation* § 327 (3d ed.1994)). Nonetheless, in *Nash v. Premium Products of Louisiana, Inc.*, 95-389 (La.App. 3 Cir. 11/2/95), 690 So.2d 43, we held that payments made to a worker for the use of his truck and equipment should be included in determining his average weekly wage. We held that the payments were associated with the worker's wages as his hourly wages decreased when the payments began and the employer discontinued the payments after his injury, but retained possession of his truck and equipment.

In this instance, we find no error in the workers' compensation judge's determination that the $20 per hour should be included in Wright's average weekly wage computation. His wages decreased by $20 per hour corresponding with the commencement of the $20 per hour payment for the use of his equipment. Also, we agree with the workers' compensation judge that it is inconceivable that an employer would pay in excess of $40,000 per year to retain an employee who only earns $10

14

per hour, especially when the equipment it is supposedly renting costs $6000 and it provides all maintenance for the employee's van. Although Cypress General only pays Sargeant $17.50 per hour, Wright was obviously a more valuable employee, who could perform many other functions than just surveying. Accordingly, the judgement of the workers' compensation judge is affirmed.

### ANSWER TO APPEAL

Wright has answered Cypress General's appeal and seeks additional attorney's fees for work performed in conjunction with this appeal. Based on our findings, we award him an additional $3000 in attorney's fees.

### CONCLUSION

For the foregoing reasons, the workers' compensation judge's judgment is affirmed. It is further ordered, adjudged, and decreed that an additional $3000 in attorney's fees is awarded to the plaintiff-appellee, Nathan Wright. The costs of this appeal are assessed to the defendant-appellant, Cypress General Contractors, Inc.

**AFFIRMED AS AMENDED.**