[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10490
Non-Argument Calendar
_____

D.C. Docket No. 0:12-cv-60497-RSR


CLIFFORD B. ORETSKY,

Plaintiff-Appellant,

versus

INFINITY INSURANCE COMPANY,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(July 26, 2013)

Before HULL, MARTIN and KRAVITCH, Circuit Judges.

PER CURIAM:

Clifford Oretsky appeals the district court's grant of summary judgment in favor of Infinity Insurance Company ("Infinity") in his diversity lawsuit alleging a breach of an insurance contract. After review, we affirm.

## I.    BACKGROUND FACTS[1]

In August 2010, plaintiff Oretsky bought a new Maserati Quattroporte vehicle for approximately $110,000 from a dealership. Immediately after purchasing the Maserati, plaintiff Oretsky called Infinity and asked an Infinity agent to obtain the same insurance coverage for the Maserati as for Oretsky's other vehicles, which were insured under Infinity's standard automobile policy. The insurance agent faxed Oretsky the insurance forms and documents, indicating with handwritten arrows the places Oretsky had to sign or initial. Without reading any of the forms or documents, Oretsky signed and initialed them, and faxed them back to the insurance agent. At the agent's request, Oretsky also emailed Infinity photographs of his Maserati.

Because Oretsky did not read the policy documents, he did not know that the insurance policy he actually obtained on the Maserati was not a standard auto policy, but a "Classic Collector's" policy, generally intended for classic or exotic

---

[1]We construe all facts and reasonable inferences in the light most favorable to plaintiff Oretsky, the non-movant. See Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1314 (11th Cir. 2011).

vehicles.[2]  As described in more detail below, this policy placed certain restrictions on vehicle usage, requiring, among other things, that the car (1) be kept in a locked garage when not in use; (2) not be driven more than 5,000 miles a year; and (3) not be used for backup transportation.

Believing that his Maserati was covered by a standard auto policy, Oretsky did not comply with all the policy restrictions.  For example, he used the car for general purposes, such as golfing, going out to dinner, or "traveling around town."  For the first year he owned the Maserati, Oretsky drove approximately 13,000 miles in the car.  Although Oretsky usually parked the Maserati in a locked garage attached to his residence, he occasionally would leave the car in the driveway overnight if he had to drive somewhere early in the morning.  As Oretsky explained at his deposition, he left the car outside because the Maserati had "special mufflers" that made a lot of noise, and he did not want to wake his son sleeping in the house.

On July 20, 2011, nearly a year after purchasing the Maserati, Oretsky picked up the car after service at the dealership.  Upon arriving home, Oretsky parked it in his driveway in front of the garage.  Oretsky intended to drive the

---

[2]Oretsky did not allege in the district court, and does not argue on appeal, that Infinity failed to provide him with the insurance policy in a timely manner.  Rather, Oretsky admits he did not read the policy documents.  At his deposition, Oretsky testified that he was not sure when, or if, Infinity had mailed him the insurance policy, as he had not looked at the policy until the day of the deposition.

Maserati to a restaurant that evening, and he left the keys on a table inside the garage in plain view.  Oretsky's plans later changed, and he decided to stay home for the night.  Before going to bed, Oretsky did not park the car inside the garage, and did not bring the keys inside the house.  Thus, the car remained parked in the driveway during the night, with the keys still on the table inside the garage.

Early on the morning of July 21, 2010, Oretsky discovered that his Maserati was stolen and that the keys inside the garage had disappeared.  There was no damage to the garage doors, and no other signs of a forcible entry, even though the entrances from the garage to the outside remained locked throughout the night.  Upon discovering the theft, Oretsky immediately called the police and filed a police report, but neither the thieves nor the Maserati were found.

Oretsky also contacted Infinity, seeking reimbursement for the Maserati pursuant to the insurance policy.  After investigating the theft and questioning Oretsky, Infinity denied coverage for the Maserati.  In its denial letter, Infinity explained that Oretsky violated the terms of the insurance policy by failing to keep the Maserati "inside a fully enclosed garage at the time it was stolen from [his] residence."

## II.     THE INSURANCE POLICY

### A.     Insurance Application

4

When Oretsky requested insurance on the Maserati, Infinity's insurance agent faxed him a form entitled "Applicant Questionnaire." This questionnaire contained arrows, handwritten by the agent, pointing to places where Oretsky had to sign or initial.

One section on the questionnaire, entitled "Program Requirements," contained six statements that Oretsky was required to initial. This section provided:

> (INITIAL INDICATING THAT YOU WILL COMPLY WITH THESE REQUIREMENTS.)
>
> 1. ___Each licensed driver in household has a regularly daily-use vehicle.
> . . . .
>
> 3. ___Vehicles insured under this policy will be kept in a permanent enclosed and locked garage at all times when not in use.
> . . . .
>
> 5. ___Vehicles usage will not exceed the mileage plan selected.
>
> 6. ___Vehicles insured under this policy will not be used for commuting to work or school, business use, daily transportation or as a substitute for another auto.

Oretsky placed his initials on the blanks next to each statement.

## B.    Declarations Page

The declarations page of the policy, titled "Declarations – Classic Collectors," named the Maserati as the insured vehicle and provided for a "mileage plan" of 5,000 miles. The declarations page also listed, by number, various

applicable "Endorsements" that were then described in the main body of the policy. These endorsements supplied changes or additions to the general provisions listed in the main body of the policy.

**C.     Collectible Vehicle Endorsement**

One of the endorsements listed on the declarations page was the Collectible Vehicle Endorsement ("CV Endorsement"). The CV Endorsement, which also cross-referenced the vehicle listed on the declarations page (the Maserati), changed the general policy provisions in several pertinent ways.

First, the CV Endorsement redefined the term "your covered auto" as "[a]ny vehicle shown in the policy Declarations" that "also meet[s] the terms of **acceptable vehicle** usage as defined in Section F."

The CV Endorsement also changed the definition of "newly acquired auto" as follows:

> K.     **newly acquired auto** means any of the following types of
>        vehicles you become an owner of during the policy period:
>
>        1.     A **collectible vehicle** for which no other insurance policy
>               provides coverage . . . .
>        . . . .

The CV Endorsement then added the following definitions:

> L.     **Collectible vehicle** means an **antique**, Classic, **modified** or
>        **exotic** vehicle.
>
>         . . . .

6

P.    **Exotic vehicle** means a private passenger vehicle or truck which:

    1.    Is not mechanically or cosmetically altered from its original condition.

    2.    Is manufactured as a limited production vehicle.

The CV Endorsement further changed "Part F – General Provisions" of the main policy by adding the following provision imposing restrictions on usage of "your covered auto":

ACCEPTABLE VEHICLE USAGE

In consideration of the premiums charged under this policy, you agree that **your covered auto**:

1.    will be used for exhibitions, club activities, parades, [and] other functions of public interest or an occasional pleasure drive;

2.    will be kept in a completely enclosed, locked, and permanent garaging facility when not in use [hereinafter, the "garage requirement"];

3.    will not be driven more than the mileage plan selected during the policy period, and;

4.    will not be used for:

    a.    backup transportation
    b.    commuting (driving to and from school or work);
    c.    business or commercial purposes;
    d.    any utility use including towing, hauling, or off road use;
    e.    participating in, practicing or testing for any racing, speed contest, time trial or track event of any kind.

Violation of above limitations without prior consent or acknowledgment from the company void[s] all coverage provided under this policy.

### III.    PROCEDURAL HISTORY

**A.    Complaint and Motions for Summary Judgment**

Oretsky sued Infinity in Florida state court for breach of the insurance contract, and attached the insurance policy to his complaint. Based on diversity jurisdiction, Infinity removed the lawsuit to the U.S. District Court for the Southern District of Florida.

After discovery, Infinity moved for summary judgment. Infinity argued that coverage was rightfully denied because Oretsky violated three terms of the insurance policy by (1) failing to keep the Maserati in a locked garage when the car was not in use; (2) driving the Maserati more than the allotted 5,000 miles per year; and (3) using the Maserati as his primary means of transportation.

Oretsky responded to Infinity's motion and filed his own motion for summary judgment, raising five main arguments as to why Infinity wrongly denied coverage. First, Oretsky contended that the CV Endorsement, which contained the pertinent restrictions on vehicle usage, did not apply to the Maserati because the Maserati was not a "collectible" vehicle as defined in the policy. Second, Oretsky argued that the garage requirement did not bar coverage because the Maserati was "in use" at the time it was stolen, and, alternatively, the term "not in use" was

8

ambiguous and should be construed against Infinity. Third, Infinity was not prejudiced by the alleged breach of the garage requirement because the Maserati would have been stolen even if it was parked in the garage, given that the thieves broke into the garage anyway to steal the keys. Fourth, Infinity should be estopped from raising any defense to coverage other than Oretsky's alleged violation of the garage requirement, as Infinity did not mention any other grounds for denying coverage in its initial denial letter. Fifth, Oretsky contended that the mileage limitation provision was unenforceable because the policy contained no references to the 5,000 mile limit other than on the declarations page.

## B.    District Court's Order

The district court granted summary judgment in favor of Infinity. The district court determined that the CV Endorsement unambiguously applied to the Maserati because the insurance policy's declarations page expressly referenced the CV Endorsement, and the CV Endorsement, in turn, expressly referenced the vehicle listed on the declarations page, i.e., the Maserati. Thus, the Maserati did not have to be a "collectible" vehicle for the endorsement to apply. The district court also observed that Oretsky must have known of the restrictions on the use of the Maserati, as those restrictions were listed on the insurance application that he signed and initialed.

9

As to the garage requirement, the district court concluded that the term "when not in use" was not ambiguous, and that Oretsky's Maserati was not "in use" when it was stolen, which meant that Oretsky breached the policy by failing to keep the Maserati inside the garage. The district court reasoned that leaving the Maserati parked in the driveway overnight was not merely incidental to the car's use, and was not a temporary stop.

Regarding prejudice, the district court determined that Infinity did not need to show prejudice under Florida law because (1) the garage requirement was a condition precedent to coverage, rather than a condition subsequent; and (2) the insurance policy expressly voided coverage if the policy requirements were violated. In any event, the district court concluded, Infinity had shown prejudice because the theft of the Maserati would have been less likely had Oretsky kept it inside the garage.

The district court further determined that, in addition to violating the garage requirement, Oretsky breached the condition that the Maserati not be used for backup transportation. The district court rejected Oretsky's argument that Infinity had waived, or should be estopped from using, this defense. The district court explained, inter alia, that Infinity expressly reserved all of its defenses prior to suit, and also raised the backup-transportation defense in its answer to Oretsky's complaint.

10

## IV.    DISCUSSION

## A.    Applicability of the Collectible Vehicle Endorsement

On appeal, Oretsky first argues that the CV Endorsement did not apply to the Maserati because the car was not "exotic" and, thus, did not qualify as a collectible vehicle.[3]

Under Florida law, a "clear and unambiguous" policy provision "should be enforced according to its terms."  Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co., 913 So. 2d 528, 532 (Fla. 2005) (internal quotation marks omitted).  "[C]ourts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties."  Id. (internal quotation marks omitted).

Here, the CV Endorsement unambiguously applied to the Maserati because the declarations page expressly listed the CV Endorsement by number, and the CV Endorsement cross-referenced to the vehicle listed on the declarations page.

Moreover, even assuming the Maserati did not fit the definition of a "collectible vehicle," nothing in the insurance policy required the covered vehicle to be a collectible vehicle.  The CV Endorsement defined "your covered auto" as

---

[3]"We review a district court's grant of summary judgment de novo, applying the same legal standard used by the district court."  Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008).  A district court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "We draw all factual inferences in a light most favorable to the non-moving party."  Shiver, 549 F.3d at 1343.  Nevertheless, the non-moving party cannot create a genuine issue of material fact through speculation, id., or evidence that is "merely colorable" or "not significantly probative," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986).

11

the vehicle listed on the declarations page, i.e., the Maserati.  Neither the CV Endorsement nor any other policy provision required "your covered auto" to be a collectible vehicle.  The CV Endorsement mentioned the term "collectible vehicle" only with respect to the "newly acquired auto" provision.

As his next argument, Oretsky contends that Infinity committed an underwriting error by insuring his Maserati under the Classic Collectors' policy, and, therefore, Infinity should be estopped from denying coverage.  This argument fails in two respects.

First, under Florida law, "in the absence of ambiguous language, a court may not look to parol evidence in ascertaining the intent of the parties to an insurance contract."  Fireman's Fund Ins. Co. v. Tropical Shipping & Constr. Co., 254 F.3d 987, 1003 (11th Cir. 2001); see also Essex Ins. Co. v. Zota, 466 F.3d 981, 987 (11th Cir. 2006) ("The court may look to parol evidence in interpreting an insurance contract only if there is an ambiguity.").  As discussed above, the CV Endorsement unambiguously applied to the Maserati, and nothing in the insurance policy required the Maserati to be a collectible vehicle.  Thus, Infinity's underwriting guidelines, which were not a part of the insurance contract, are irrelevant in determining the scope of coverage under the policy.

Second, even if Infinity committed an underwriting mistake in issuing the Classic Collectors policy on the Maserati, Infinity was not estopped from denying

12

coverage. "The essential elements of estoppel are (1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon." Lloyds Underwriters at London v. Keystone Equip. Fin. Corp., 25 So. 3d 89, 93 (Fla. 4th DCA 2009) (internal quotation marks omitted).

Oretsky cannot show the first element of misrepresentation—that Infinity misrepresented to Oretsky that the policy it issued for the Maserati did not contain the restrictions set forth in the CV Endorsement. To the contrary, Infinity made it abundantly clear that the CV Endorsement would apply. Infinity asked Oretsky to fill out and sign an application questionnaire listing each of the usage requirements contained in the CV Endorsement, including the garage requirement. To obtain coverage, Oretsky had to place his initials next to each requirement, thereby certifying that he had read the requirement and would comply with it. Thus, Infinity in no way misrepresented what vehicle usage restrictions came with the policy. And Oretsky's alleged failure to read either the questionnaire or the policy is of no moment. See Baum v. Allstate Ins. Co., 496 So. 2d 201, 204 (Fla. 4th DCA 1986) ("It is axiomatic that absent unusual circumstances . . . one cannot claim ignorance of the contents of a written instrument which one signs.").

## B.    Garage Requirement

Oretsky next argues that, even if the CV Endorsement applied, Infinity wrongfully denied coverage because he had complied with the requirement that the Maserati be kept in a garage "when not in use."  Oretsky contends that his Maserati was "in use" when it was stolen because parking the car in the driveway was essentially a temporary stop between outings, rather than a cessation of use.  Alternatively, he argues, the term "when not in use" is ambiguous and should be construed against Infinity.

"In accordance with well-established rules of interpretation, terms utilized in an insurance policy should be given their plain and unambiguous meaning as understood by the 'man-on-the-street.'"  State Farm Fire & Cas. Co. v. Castillo, 829 So. 2d 242, 244 (Fla. 3d DCA 2002).  "An ambiguity arises when more than one interpretation may fairly be given to a policy provision."  Id. at 245 (internal quotation marks omitted).  However, "[a] provision is not ambiguous simply because it is complex or requires analysis."  Garcia v. Fed. Ins. Co., 969 So. 2d 288, 291 (Fla. 2007).

In this case, the term "when not in use" is not ambiguous.  Regardless of whether this term may be ambiguous in other contexts, we have little trouble concluding that, under this particular set of facts, Oretsky's Maserati was not in use when it was stolen.  After having the Maserati serviced on July 20, 2011, Oretsky parked the car at his residence, next to the garage where it was usually kept.  At the

14

time Oretsky went to bed the evening of July 20, he did not intend to use the Maserati until the next morning.  Under any reasonable construction of the term, the Maserati was not "in use" while it was sitting in the driveway during the night and while Oretsky slept in the house.  Thus, Oretsky violated the policy's garage requirement by failing to park the Maserati in the garage on the night it was stolen.[4]

## C.    Prejudice

Oretsky argues that, even if he violated the garage requirement, Infinity should not have denied coverage because it suffered no prejudice from the violation.  Oretsky asserts that the Maserati would have been stolen even if it had been parked in the garage, given that the thieves broke into the garage and stole the keys.

To support his argument, Oretsky relies on § 627.409(2) of the Florida Statutes, also known as the "anti-technical statute," which provides:

> A breach or violation by the insured of any warranty, condition, or provision of any wet marine or transportation insurance policy, contract of insurance, endorsement, or application therefor does not void the policy or contract, or constitute a defense to a loss thereon, unless such breach or violation increased the hazard by any means within the control of the insured.

---

[4]Because we find the term "not in use" to be unambiguous in this case, we decline Oretsky's invitation to certify the question of the term's meaning to the Florida Supreme Court. See Ruderman ex rel. Schwartz v. Wash. Nat'l Ins. Corp., 671 F.3d 1208, 1212 (11th Cir. 2012) (stating that federal courts should certify questions to the state supreme court for "truly debatable questions").

Fla. Stat. § 627.409(2). This statute "is designed to prevent the insurer from avoiding coverage on a technical omission playing no part in the loss." Pickett v. Woods, 404 So. 2d 1152, 1153 (Fla. 5th DCA 1981). Otherwise, if the insured breached some condition of the policy not pertinent to the loss, "the insurer would collect a premium but would have no exposure to risk because the policy would no longer be effective." Id.

As an initial matter, § 627.409(2) likely does not apply to motor vehicle casualty insurance policies. First, by its terms, the statute only applies to "wet marine or transportation" policies, and not to other types of insurance. See Fla. Stat. § 627.409(2); Indep. Fire Ins. Co. v. Paulekas, 633 So. 2d 1111, 1113 (Fla. 3d DCA 1994) (stating that § 627.409(2) did not apply to a homeowner's insurance policy). Second, the term "transportation," as used in the statute, generally refers to the transport or shipment of goods in commerce, not to the use of motor vehicles for personal conveyance. See Fla. Stat. § 624.607(2) (defining the term "wet marine and transportation insurance" as "that part of marine insurance which includes," among other things, "[i]nsurance of personal property and interests therein, in course of exportation from or importation into any country, or in course of transportation coastwise or on inland waters . . . by land, water, or air . . . in connection with any and all risks or perils of navigation, transit, or transportation").

16

But even if § 627.409(2) applied to motor vehicle policies, such as the one in this case, Infinity has shown prejudice from Oretsky's violation of the garage requirement. Common sense dictates that a car parked in a closed and locked garage is less likely to be stolen than a car parked in an open driveway, and that the garage requirement was designed at least in part to avoid loss through theft.

Oretsky does not challenge these common-sense conclusions. Rather, he asserts that the Maserati would have been stolen even if it had been parked inside the garage, as the thieves were familiar with Oretsky's routine, knew that he kept the keys inside the garage, and knew how to access the garage when locked. This assertion is pure speculation and finds no support in the record. See Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008) ("Speculation does not create a genuine issue of fact." (internal quotation marks omitted)). And indulging Oretsky's theory would not change the outcome. At a deposition, Oretsky himself testified that he left the Maserati in the driveway because starting the car in the garage could wake his son sleeping in the house. If the thieves were indeed familiar with Oretsky and his Maserati, they certainly would have been more hesitant to steal the car if it had been parked inside the garage, for fear of waking the occupants.

Furthermore, by its plain terms, § 627.409(2) does not require a policy violation to be the sole cause of the loss, but only requires the violation to

17

"increase[] the hazard by any means within the control of the insured." See Fla. Stat. § 627.409(2); see also Eastern Ins. Co. v. Austin, 396 So. 2d 823, 825 (Fla. 4th DCA 1981) (holding that § 627.409(2) did not void coverage after a boat wreck where the insured violated the insurance policy by occasionally selling fish caught from the boat, because "the occasional sale of fish caught on a pleasure fishing trip [had no] relevancy whatsoever" to the hazard encountered by the boat). Here, even if parking the Maserati in the garage ultimately would not have prevented the theft, Oretsky's failure to do so certainly increased the danger of theft. Thus, § 627.409(2), if applicable at all, does not prevent Infinity from denying coverage based on the garage requirement.[5]

In light of the foregoing, we affirm the district court's grant of summary judgment to Infinity.

**AFFIRMED.**[6]

---

[5]Because we conclude that Infinity properly denied coverage based on the garage requirement, we do not consider whether Oretsky violated other requirements of the CV Endorsement, or whether Infinity could have denied coverage based on those violations.

[6]Oretsky moved this Court for an award of attorney's fees under Florida law "[i]n the event he prevails on appeal." Given our affirmance, we DENY Oretsky's motion as moot.

18