STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

06-1442

TONI W. ODOM

VERSUS

KINDER NURSING HOME

**********
APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 3
PARISH OF CALCASIEU, NO. 03-03313
CHARLOTTE A. L. BUSHNELL, WORKERS' COMPENSATION JUDGE
**********

**GLENN B. GREMILLION**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy and Glenn B. Gremillion, Judges.

**AFFIRMED.**

Robert T. Jacques, Jr.
1039 Common Street, Suite A
Lake Charles, LA 70601
(337) 433-4674
Counsel for Plaintiff/Appellee:
    Toni W. Odom

Craig A. Davis
111 Mercury
Lafayette, LA 70503
(337) 231-5351
Counsel for Defendant/Appellant:
    Kinder Nursing Home

GREMILLION, Judge.

The defendant, Kinder Nursing Home, appeals the workers' compensation judge's judgment finding the plaintiff, Toni Odom, permanently and totally disabled and entitled to recommended psychological medical treatment. Odom was further awarded penalties and attorney's fees as a result of its improper reduction of her indemnity benefits and its failure to properly investigate her claim. For the following reasons, we affirm.

**FACTS**

Odom was employed as the night staff nurse for Kinder Nursing Home. On July 24, 1997, she was leaning against a bed rail while hanging a feeding bag, when it gave way causing her to fall and strike her head. As a result, she lost consciousness for approximately twenty minutes and injured her right arm and wrist, head, neck, and upper and lower back. She was treated at the Lake Charles Memorial Hospital Emergency Room for a cervical strain and a closed head injury and told to follow up with her primary care physician, Dr. Peggy Allemand. Dr. Allemand ultimately referred her to Dr. Paul Mayes, a physiatrist, due to persistent musculoskeletal pain.

On May 7, 2003, Odom filed a disputed claim for compensation alleging that Kinder Nursing Home had wrongly reduced her indemnity benefits from temporary total disability benefits to supplemental earnings benefits on May 4, 2003, had provided her with inadequate vocational rehabilitation, disputed her disability status, and was liable for penalties and attorney's fees on each issue. She amended her disputed claim to later allege that it failed to authorize the EMG/nerve conduction study and speech therapy recommended by its neurologist, Dr. Steven Zuckerman, and

her treating physicians. Odom further alleged that Kinder Nursing Home had provided her with sham rehabilitation and that it should be liable for maximum penalties and attorney's fees.

Following a trial on the merits, the workers' compensation judge rendered written reasons finding that Odom was temporarily totally disabled from a pain management standpoint. The workers' compensation judge further stated that she did not believe that Odom was malingering neuropsychologically, but appointed an independent medical examiner to conduct a neuropsychological assessment to address whether her current psychological condition was work-related. Thereafter, an independent medical examination was performed on Odom by Dr. Lawrence Dilks, a clinical neuropsychologist. In his September 9, 2005 report, he determined that she met the criteria for cognitive impairment, secondary to post-concussion syndrome, pain disorder, physiological and psychological features; moderate depression, secondary to pain disorder; post-traumatic stress disorder; and insomnia, secondary to pain disorder. Dr. Dilks further found that Odom's cognitive impairment and post conversion syndrome were a direct result of her work-related injury.

During the interim, Odom filed a third disputed claim for compensation alleging that Kinder Nursing Home improperly altered her supplemental earnings benefits back to temporary total disability benefits on June 20, 2005, without providing proper notice of the alteration. She further sought penalties and attorney's fees based on this action.

Based on Dr. Dilks' evaluation, the workers' compensation judge rendered oral reasons for judgment finding that Odom's psychological problems were

2

compensable. Judgment was then rendered finding that Odom was temporarily and totally disabled from a pain management standpoint, that her central pain disorder resulted from her work-related injury, and that she was not malingering neuropsychologically. The workers' compensation judge further held that she gave significant weight to Dr. Dilk's evaluation and found Odom's psychological problems compensable. Following the rendition of this judgment, both Odom and Kinder Nursing Home filed motions for new trial, which were granted.

After taking the matter under advisement, the workers' compensation judge rendered judgment finding that the medical evidence preponderated in Odom's favor from a pain management standpoint and that her psychological problems were compensable injuries. The workers' compensation judge further held that Kinder Nursing Home failed to provide suitable vocational rehabilitation to Odom, that she did not violate the La.R.S. 23:1208 fraud statute, and that she was permanently and totally disabled. Finally, the workers' compensation judge held that Kinder Nursing Home improperly reduced Odom's temporary total disability benefits to supplemental earnings benefits, failed to reasonably investigate her claim, and awarded her $4,000 in penalties and $12,000 in attorney's fees. This appeal by Kinder Nursing Home followed.

**ISSUES**

On appeal, Kinder Nursing Home raises eight assignments of error. It argues that the workers' compensation judge erred in finding that:

1. Odom proved by clear and convincing evidence that she was permanently and totally disabled as a result of her work-related accident.

3

2. Odom's psychological problems were related to her work-related accident.

3. Kinder Nursing Home failed to provide Odom with suitable vocational rehabilitation.

4. Odom did not violate La.R.S. 23:1208.

5. From a pain management standpoint, the medical evidence preponderates in Odom's favor.

6. Kinder Nursing Home improperly reduced Odom's temporary total disability benefits to supplemental earnings benefits.

7. Kinder Nursing Home did not reasonably controvert Odom's claims and in awarding penalties and attorney's fees.

8. Kinder Nursing Home failed to reasonably investigate Odom's claim.

Odom has filed an answer to appeal seeking additional attorney's fees for work performed on appeal.

## STANDARD OF REVIEW

As in other civil matters, the standard of review applied to factual findings in workers' compensation matters is the manifest error standard. This standard, which is based upon the reasonableness of the factual findings in light of the record reviewed in its entirety, is well established in our jurisprudence following the seminal cases of *Rosell v. ESCO*, 549 So.2d 840 (La.1989), and *Stobart v. State, through Department of Transportation and Development*, 617 So.2d 880 (La.1993).

## DISABILITY STATUS

In its first assignments of error, Kinder Nursing Home argues that the workers' compensation judge erred in finding that Odom proved by clear and

4

convincing evidence that she is permanently and totally disabled as a result of her work-related accident. It further argues that the workers' compensation judge erred in finding that Odom's psychological problems stemmed from her work-related accident and that she satisfied her burden of proof with regard to her pain management treatment.

An injured employee will be entitled to recover permanent and total disability benefits if he or she proves their inability to engage in any type of employment by clear and convincing evidence. La.R.S. 23:1221(2)(c). "The issue of disability within the framework of the workers' compensation law is a legal rather than a purely medical determination. *LeBlanc [v. Grand Isle Shipyard, Inc.*, 95-2452 (La.App. 1 Cir. 6/28/96)], 676 So.2d [1157,] 1161. The issue of disability is determined with reference to the totality of the evidence, including both lay and medical testimony. *LeBlanc*, 676 So.2d at 1161." *Walker v. High Tech Refractory Servs., Inc.*, 03-1621, p. 4 (La.App. 1 Cir. 6/25/04), 885 So.2d 1185, 1188.

Moreover, before an injured employee may be found permanently and totally disabled, La.R.S. 23:1226(D) requires the workers' compensation judge to consider the likelihood of the employee being rehabilitated through training or education to the extent that he or she may become gainfully employed again. In *Comeaux v. City of Crowley*, 01-0032, p. 13 (La. 7/3/01), 793 So.2d 1215, 1222, the supreme court stated, "Obviously, the Legislature intended, by imposing in La.Rev.Stat. 23:1226 a mandate that the prospects of rehabilitation be explored before an employee is classified as permanently, totally disabled, that the results–negative as well as positive–of such attempted rehabilitations be considered in ultimately

5

determining disability status."

Dr. Mayes began treating Odom on October 15, 1997, and continued her treatment up to and after the trial on the merits in this matter. Initially, he stated that she suffered from post-concussive syndrome or a closed head injury and mild and increased tone in her right arm. He felt that the pain in her arm was caused by a central pain syndrome or thalmic pain syndrome, which he described as occurring in stroke and head injury cases when:

> [T]he effected side of the body is intertwined centrally in the brain with many mechanisms that control function and sensory and tone; and an environment is set up such that the brain reports pain in the effected limb and it's modulated and controlled in the brain as opposed to in the limb.

Dr. Mayes testified that Odom's condition has worsened over time. By March 28, 2003, he stated that it had become static for a history of a closed head injury, which led to the development of a central pain disorder, a right C6-7 radiculopathy, and an ulnar and medial neuropathy in her right arm. He stated that she suffers from speech and cognitive impairment, mood disorder including depression and anxiety, and generalized osteoarthritis. He said that she further has a gait disorder requiring the use of a cane, and occasional spasticity, i.e. tics and clonus. In addition to these work-related problems, Dr. Mayes testified that Odom suffers from various other medical conditions, including coronary artery disease; diabetes mellitus, with its likely accompanying peripheral neuropathy; peripheral vascular disease; gastroesophegeal reflux disease; and obesity.

Dr. Mayes stated that although mild head injuries usually resolve within three months, Odom developed the central pain disorder, which affects her right upper and lower limbs. He described Odom's right arm and shoulder as being practically

6

frozen, in that she holds her arm in a contracted position against her body and has difficulty moving her elbow and shoulder. He related this to either the cervical radiculopathy or the central pain disorder. He stated that the pain in her arm affects her ability to grip and lift things and is chronic in nature. Dr. Mayes testified that the C6-7 radiculopathy and the median and ulnar peripheral nerve injuries, alone, could be disabling, but certainly would be a major contributor to her current disabilities. He further stated that if these conditions are not addressed early on, they become permanent.

Dr. Mayes further related Odom's depression to her work-related injuries. He stated that Kinder Nursing Home has refused to authorize psychological treatment for Odom despite his request for such treatment early on in his treatment of her. While Kinder Nursing Home finally approved a neuropsychological evaluation, he said that it did not authorize any followup treatment, despite the finding that Odom was very depressed, which he said was common in head-injury patients. He further said that it was normal for a patient, such as Odom, who was questioned about the veracity of her symptoms over a period of years, was examined in an adverse way, was not able to work, and had suffered a loss of income, to be depressed.

Dr. Mayes further said that he could not separate Odom's psychological problems from her physical problems. Although he agreed that she had suffered from depression prior to her work accident, he stated that she was working and functioning prior to her fall. However, afterwards, he said that her condition worsened. With regard to her speech impairment, Dr. Mayes testified that it was either caused by her psychological problems or by "vascular problems in her brain with a speaking

7

mechanism in her throat." He stated that he has recommended speech therapy to address this problem, which Kinder Nursing Home has never authorized.

As of January 14, 2005, Dr. Mayes stated that Odom was still totally disabled. He related this to the C6-7 radiculopathy, the peripheral neuropathy involving her right arm, her chronic pain disorder, and her severe depression. He further stated that he did not feel that she should undergo a functional capacity evaluation.

Early on, Kinder Nursing Home had Odom examined by Dr. Gregory Gidman, an orthopaedic surgeon. In his March 4, 1998 report, he said that he could not explain the unusual presentation of her right upper extremity or her multiple complaints. Although he noted that she had end-stage osteoarthritis in both knees, he said that he could provide no orthopaedic explanation for her gait or her inability to move her right upper extremity. As Odom had suffered a head injury and there was a question of whether she had suffered a stroke, Dr. Gidman recommended that she see a neurologist/neurosurgeon. He then suggested that she undergo an MRI of her shoulder and then a psychiatric evaluation for possible psychosocial factors. If both tests were negative, he opined that she would be at maximum medical improvement and could return to work pursuant to a functional capacity evaluation.

Kinder Nursing Home next referred Odom to Dr. John Clark, a physiatrist. In his February 22, 2001 report, he found that Odom had suffered a significant brain trauma as a result of her accident, which caused her spastic right hemiparesis, motor imbalance, speech and language deficits, as well as chronic myofascial pain with superimposed thalmic pain syndrome. Dr. Clark opined that

8

Odom's chronic pain stemmed from her increased tone with superimposed thalmic pain condition and that she was incapable of returning to work due to her impairments. He recommended that she undergo an MRI of the brain, a neuropsychological evaluation, and speech therapy. He also suggested an occupational therapy evaluation of her home in order to outfit it with grab bars and a tub bench.

Dr. Zuckerman examined Odom once at Kinder Nursing Home's request. In his April 18, 2001 report, he doubted whether any of her symptoms were physiological and, although he found her report of a head injury to be very ambiguous, he opined that a mild closed head injury would not cause the sort of persistent problems suffered by her. He further felt that such an injury should have resolved within three months. Dr. Zuckerman recommended that Odom undergo an MRI of the brain to exclude the possibility that she had suffered a stroke. If it was negative, then he recommended an EMG/nerve conduction study of the right arm to exclude any nerve root or peripheral nerve dysfunction. Otherwise, he recommended a psychiatric evaluation for an assessment of malingering. Subsequent to a normal June 8, 2001 MRI of the brain, Dr. Zuckerman found no physical basis for Odom's ongoing complaints; therefore, he opined that she could return to work at full duty with no restrictions.

Dr. Rennie Culver, a psychiatrist, also evaluated Odom once at the request of Kinder Nursing Home. In his October 1, 2001 report, he stated that Odom was obviously depressed and he was unable to determine the onset of this condition due to her reluctance to give him relevant information. However, he noted that Dr. Allemand's medical records documented that she was depressed prior to her work-

9

related accident, and he opined that the source of this depression was the declining health and later deaths of her parents and the fact that she bore three illegitimate children for the same doctor.

Dr. Culver felt that Odom was malingering or suffering from a factitious disorder and indicated that she was positive for three of the four criteria for malingering. He felt that she had suffered a very mild traumatic brain injury as a result of her fall, which should have resolved within three months. He based a finding of malingering on her inconsistent clinical presentation which he said had resulted in a number of diagnoses over the years and with little improvement. He explained that one of the hallmarks of malingering or factitious disorders is the failure of the patient's complaints to conform to any known medical problem or that the complaints are so inconsistently presented that they result in a number of different diagnoses. Dr. Culver recommended that Odom undergo a psychological evaluation to define the parameters of her mental condition and a functional capacity evaluation to define the nature of her problems.

Dr. Charles Robertson, a clinical psychologist, performed a neuropsychological evaluation, which was authorized by Kinder Nursing Home based on Dr. Zuckerman's recommendation. In his extensive report, he summarized his findings and recommendations as follows:

> Toni Odom is a 49 year old, white female outpatient, referred by Dr. Paul Mayes for neuropsychological assessment. Current test results reflect problems in the cognitive domain with distractability, sustained attention, and speed of mental operations. There were no clear indications of lateralized impairments which would suggest a stroke. Language screening reflected dysarthria and dyscalculia but found adequate verbal fluency with no classic aphasic or apraxic disorders. Intellectual measures suggested greater non-dominant hemisphere

impairments in visual-spatial tasks with low-average overall functioning. Memory problems found were confounded by attention and concentration problems. Effort demanded by the tasks was a potent predictor of memory performance, suggesting a depression effect. Higher-order reasoning and problem solving was moderately impaired.

Problems in the psychological domain include severe depression and anxiety with likely conversion of psychological stress to physical complaints. A history of psychological instability is reflected. She has complaints consistent with a diagnosis of pain disorder.

Overall results from neuropsychological assessment are more suggestive of severe psychiatric problems than brain injury. She would not be expected to have her current level of difficulty with attention and concentration four years after a mild brain injury. This is not to say she did not sustain a brain injury in her fall 4 years ago, however. The level of impairment found suggests a more acute problem such as a response to medication, psychiatric illness, or more recent brain injury. No clear pattern of lateralized brain injury was found to account for her appearance of hemiparesis. Her language problems are atypical. A more detailed assessment by a certified speech pathologist is warranted.
She does not present as someone malingering neuropsychological impairment, however. Validity measures were all passed. She appears more to be convinced she has severe medical problems and is quite worried about her health. She may convert psychological stress to physical symptoms and completely lack insight into doing so.

While neuropsychological syndromes are not clearly present, her psychiatric profile is less ambiguous. A severe major depression with anxiety is present and probably related to her chronic pain complaints. She also matches diagnostic criteria for somatoform disorder. A history of personality disorder is also likely.

I advise prompt referral for aggressive psychiatric treatment of depression and anxiety. She may respond to medical reassurance about her physical complaints. She should be scheduled for an evaluation by a certified speech pathologist. I can arrange this through my office if needed. She should continue in pain management care with Dr. Mayes. He can determine her readiness to return to work based on limitations from chronic pain and medication. However, I believe her severe psychiatric illness presently prevents her from returning to work. A combination of psychiatric medical management and cognitive behavioral therapy by a neuropsychologist is advised. Once her depression and anxiety resolve, a repeat neuropsychological evaluation may be more revealing.

After performing his court-ordered neuropsychological evaluation, Dr. Dilks opined that Odom was suffering from a mild post-concussion syndrome, along with impairments in her memory, judgment, and reasoning. He further found that her profile was indicative of major depression. Based on his findings, he recommended the following actions: 1) psychiatric consultation and follow-up treatment; 2) neurological consultation and follow-up treatment; 3) physical therapy consultation; 4) driving evaluation; 5) individual counseling for depression; 6) group counseling for post-traumatic stress disorder; 7) vocational evaluation; 8) sleep study; 9) speech and language evaluation and follow-up treatment; and 10) re-evaluation in one year. Finally, Dr. Dilks related Odom's findings directly to her on-the-job injury.

Odom testified that her condition worsened progressively after her fall until she was unable to use her right arm and had to use a cane due to the pain in her right leg and her problems with balance. Although she suffered from preexisting arthritis in her right knee, she said that the fall increased her arthritis. She further stated that her arthritis medication affected her kidneys so she no longer took it. As a result, she stated that she suffered greater pain and increased difficulty in walking.

Odom further testified that she now has difficulty speaking and suffers from increasing depression since her accident. She said that she feels depressed and frustrated because of her loss of independence and her inability to do things for herself since the accident. She stated that she lives alone, but said that her daughter visits her and she has hired someone to clean her house. She said that she lacks stamina and is no longer able to vacuum, sweep, or make her bed; however, she stated that she can load her dishwasher, cook, and wash and fold clothes using one hand.

12

Odom testified that she is able to drive her car, which is an automatic, in Kinder and to Eunice, which is twenty-five miles away. However, she said that she requires a driver to go anywhere else, as she is not as confident driving as she was prior to her fall. She stated that this is especially true when she is driving on the interstate, as she does not believe that she would think or react quickly enough in an emergency.

Britaney Bogard, Odom's daughter, testified that she has noted tremendous declines in her mother's mental and physical capabilities since her fall. Prior to that, she stated that Odom worked a ten-day shift for Kinder Nursing Home, raised her three children singlehandedly, and did practically everything for herself. However, afterwards, she stated that Odom began experiencing problems with her speech, the use of her right arm and leg, and increasing depression. Now, she stated that Odom's speech comes and goes and that she uses a four-legged cane to walk. Bogard testified that she and her husband both left well-paying positions in Orlando, Florida to return to Kinder in order to care for her mother.

Bogard stated that Odom's inability to use her right arm prevents her from drawing and painting. She said that her mother was an accomplished artist, but now she uses her left arm for writing and eating. Although she stated that Odom is able to drive and visit her friend, who lives ten miles away, she said that she requires a driver to go anywhere else. She further testified that she and her husband purchased a scooter for Odom to get her out of the house and do things.

Although Bogard admitted that Odom was depressed due to the illnesses and later deaths of her parents, she stated that her depression increased after her fall.

13

She testified that Odom becomes more depressed if she is unable to leave her home and that she feels okay as long as she remembers to take her medication. However, she said that she can tell when Odom forgets to take her medication. She stated that Odom will start crying just from watching a commercial on television. Now, she testified that they cannot watch any movie which has a sad ending and that her mother tries to focus only on good things.

Ronnie Smith, an independent nurse case manager, testified as a friend of Odom's. He stated that he was the administrator of Kinder Nursing Home from 1978 through 1991, and that he hired Odom as the night LPN. Prior to her accident, he testified that Odom was an excellent employee, who supervised 100 patients and four nurses' assistants as the night nurse. While he worked for Kinder Nursing Home, he stated that he never noticed that Odom was depressed to such an extent that she was unable to work. He further admitted that she was slightly overweight and that she walked with a slight abnormality as a result of arthritis in her legs. However, he said that neither problem hindered her in any way. He did testify that the way she walks has changed since her fall.

Smith said that he has seen a drastic change in Odom since her fall. He stated that her thought process has become much slower and that her speech has deteriorated. He said that her speech is better on some days than others, but that sometimes she speaks very slowly and does not make complete statements or sentences. He said that she occasionally speaks clearer when she is aggravated, but that her speech slows down again when she becomes calmer.

14

Karen Pelican and Helen Daniels both work for Kinder Nursing Home; Pelican as secretary and Daniels as Odom's relief nurse. Both testified that Odom walked with a limp prior to her accident and that they noticed no difference in how she walked prior to her fall than how she walked afterwards. Daniels testified that Odom did not use a cane prior to her fall.

In her written reasons for judgment, the workers' compensation judge held that Odom carried her burden of proof with regard to the issue of pain management based on the testimony from Drs. Mayes and Clark. The workers' compensation judge recalled that Dr. Mayes opined that Odom was suffering from a central pain disorder as a result of her brain injury, while Dr. Clark found that she suffered from a "spastic right hemiparesis, motor imbalance, speech and language deficits, as well as chronic myofascial pain with superimposed thalamic pain syndrome." Both doctors felt that Odom was incapable of returning to work as a result of her impairments. The workers' compensation judge further held that Odom's psychological problems were work-related based on Dr. Robertson's and Dr. Dilks' neuropsychological assessments. Although Drs. Zuckerman and Culver found no relationship between Odom's psychological condition and her work-related injury, the workers' compensation judge held that Odom proved by clear and convincing evidence that they were a direct result of her work-related accident.

On the issue of disability, the workers' compensation judge stated in her written reasons for judgment:

> It is undisputed that Dr. Mayes, claimant's treating physician and Dr. Clark, defendant's choice of physician, opined that claimant in (sic) not capable of returning to work. Notwithstanding the fact that claimant has

15

other non-work related medical concerns, the fact remains that she has not been released to work by her treating pain management physician, Dr. Mayes, as well as by defendant's pain management physician, Dr. Clark. The court appointed psychologist, Dr. Dilks, does not believe claimant is capable of working. In addition, Dr. Dilks indicates that Ms. Odom's neuropsychological assessment suggests cognitive impairment and post-concussion syndrome that directly relate to her job injury.

Based on the evidence presented, the court finds that the totality of the evidence demonstrates that it will be impossible due to claimant's mental instability and physical limitations for claimant to work. The fact that Ms. Odom can do limited activities at certain times for limited periods of time does not equate to employment capability. Reeves v. International Maintenance Corporation, [05-1149 (La.App. 3 Cir. 4/5/06)] 926 So.2d 105 (La.App. 3 Cir. 4/5/06). Accordingly, this court finds that claimant is permanently and totally disabled.

After reviewing the record in its entirety, we find no error in the workers' compensation judge's finding that Odom is permanently and totally disabled. Dr. Mayes, who has treated Odom continuously from two months post- accident, said that she was totally disabled as a result of her C6-7 radiculopathy, the peripheral neuropathy involving her right arm, her chronic pain disorder, and her severe depression. In finding this, he did not take into account Odom's additional health problems such as her cardiac problem, diabetes, and peripheral vascular disease. Moreover, Dr. Clark, Kinder Nursing Home's choice of physiatrist, and Dr. Robertson both felt that Odom was incapable of returning to work.

Although Drs. Zuckerman and Culver found no relationship between Odom's fall and her psychological problems and felt that she was malingering and was capable of returning to work at full duty, we find no error in the workers' compensation judge's decision to instead credit the testimony of Drs. Mayes, Robertson, and Dilks. Both Drs. Robertson's and Dilks' reports indicate that Odom

16

passed all tests for validity and that she was not seen as malingering. Accordingly, the workers' compensation judge's judgment, finding that Odom proved by clear and convincing evidence that her psychological and pain management problems resulted from her work-related accident and that she is permanently and totally disabled, is affirmed.

## VOCATIONAL REHABILITATION

In its next assignments of error, Kinder Nursing Home argues that the workers' compensation judge erred in finding that it failed to provide Odom with suitable vocational rehabilitation services.

An employee, who suffers a work-related injury rendering her incapable of earning wages equal to or in excess of her pre-injury wages, is entitled to prompt rehabilitation services from a licensed vocational rehabilitation counselor chosen by the employer. La.R.S. 23:1226(A) and (B)(3). The goal of rehabilitation is to return the disabled worker to employment as quickly as possible, with as little retraining as possible.

In this instance, the workers' compensation judge held that Kinder Nursing Home failed to provide Odom with suitable vocational rehabilitation services, as it failed to meet the standard for proving job availability as set out in *Banks v. Industrial Roofing & Sheet Metal Works, Inc.*, 96-2840 (La. 7/1/97), 696 So.2d 551. There, the supreme court stated:

> [A]n employer may discharge its burden of proving job availability by establishing, at a minimum, the following, by competent evidence:
>
> (1) the existence of a suitable job within claimant's physical capabilities and within claimant's or the employer's community or

17

reasonable geographic region;

(2) the amount of wages that an employee with claimant's experience and training can be expected to earn in that job; and

(3) an actual position available for that particular job at the time that the claimant received notification of the job's existence.

By "suitable job," we mean a job that claimant is not only physically capable of performing, but one that also falls within the limits of claimant's age, experience, and education, unless, of course, the employer or potential employer is willing to provide any additional necessary training or education.

*Id.* at 557 (footnote omitted).

Marcy Holmes was hired by Employer's Risk Management Services to provide vocational rehabilitation services to Odom. She stated that she received Odom's file on April 17, 2002, but closed it in September 2002, without completing her evaluation as Dr. Mayes would not release Odom to return to work.

In her July 25, 2002 report, Holmes noted the following barriers to Odom's successful rehabilitation: 1) secondary conditions-arteriosclerotic vascular disease, diabetes mellitus, and peripheral vascular disease; 2) observed and reported inability to use her right arm for functional activity; 3) evidence of dysarthrimic speech-difficulty with word finding and expression; 4) obvious physical disability as evidenced by use of a cane and dysarthrimic speech; and 5) prescribed medications affecting cognition and her ability to drive-Vicodin, Xanax, and Ambien.

Holmes testified that she completed a generic labor market survey in which she located seven sedentary positions. She admitted that the positions did not necessarily match Odom's qualifications or vocational background, but described the survey as a snapshot of the positions available between August 8-18, 2002. The

18

positions were 1) slot clerk at Island Gold, Isle of Capri Casino; 2) reservation clerk, Isle of Capri Casino; 3) c.b.x. operator at Lake Charles Memorial Hospital; 4) r.v. guest services representative, Grand Casino Coushatta; 5) registrar position, Women and Childrens Hospital; 6) counter sales representative, AAA Cleaners; and 7) revenue auditor, Isle of Capri Casino.

Holmes testified that she did not feel that there was anything more she could offer Odom until she knew what her physical capabilities were. However, she said that Dr. Mayes indicated that he would not order a functional capacity evaluation for Odom due to her secondary diagnosis of peripheral vascular disease and peripheral neuropathy. Holmes further stated that Dr. Mayes never differentiated as to whether Odom was disabled as a result of her work-related accident or due to her peripheral vascular disease or neuropathy.

Crystal Younger, the owner and manager of Younger and Associates, testified that her company was hired by Employer's Risk Management Services to provide vocational rehabilitation services to Odom. She stated that her former employee, Shelly Brantley, performed the actual work on Odom's file, but has since left the vocational rehabilitation field. In reviewing the file, Younger testified that Odom's counsel would not let her meet with Brantley because he complained that Kinder Nursing Home was shopping around for vocational rehabilitation services. She further stated that the file indicated that a June 26, 2002 report by Holmes said that Dr. Mayes placed Odom at maximum medical improvement for her mild brain injury, but that she was not at maximum medical improvement for her unrelated physical problems of peripheral vascular disease and depression.

19

Younger testified that Brantley performed a labor market survey based on Dr. Mayes' finding that Odom was at maximum medical improvement for her brain injury. However, she described it as being hypothetical as Brantley was limited to Holmes' information from her initial meeting with Odom. She stated that five positions were found which were approved by Drs. Culver and Zuckerman.

Younger identified the five jobs in the survey. The first job was for a pit clerk at Harrah's Casino in Lake Charles. She stated that this job was situated in a high volume environment and entailed key wording and the use of a computer terminal. The second job was a c.b.x. operator at Harrah's Casino in Lake Charles. The job description required the employee to provide professional, courteous, and efficient service at all times; to present oneself as a credit to Harrah's; required dexterity to perform several functions at the same time; and possess a pleasant and easily comprehensible voice. The third position was for a cashier checker at Piccadilly in Lake Charles. This entailed using a cash register and interacting with customers. The fourth job was for a front desk clerk at Motel Six in Lake Charles. The fifth job was a direct care position with Robinswood School in Lake Charles, which entailed supervising and observing developmentally disabled adults. This position was a light duty job and required occasionally lifting of ten to twenty pounds, frequent sitting, standing, occasional walking, and rare bending, twisting, and reaching above the shoulder.

Dr. Mayes felt that Odom was incapable of performing all of these positions, as she lacked the physical dexterity to perform most of the positions' functions and would be hindered by her balance problems. When questioned, Dr.

20

Mayes stated that he did not believe it was reasonable to think that Odom could perform any of these jobs.

Melissa Vaughn, a claims representative for Employer's Risk Management Services, handled Odom's claim as the third party administrator for Kinder Nursing Home. She testified that she hired Holmes to conduct a labor market survey for Odom, but removed her from the file when she failed to do so based on Dr. Mayes refusal to release Odom to return to work. She stated that she wanted the labor market survey because Drs. Culver and Zuckerman had released Odom to work based on her work-related problems. Vaughn testified that she never attempted to obtain Dr. Mayes approval for the jobs and she never sent the job descriptions to any other treating physician. Finally, she admitted that Odom was never provided any vocational rehabilitation services, other than the labor market survey conducted by Younger.

In her reasons for judgment, the workers' compensation judge held that Kinder Nursing Home failed to satisfy the standards set out in *Banks*. Specifically, she stated that the vocational rehabilitation counselor failed to identify any actual position that was within Odom's physical capabilities and her reasonable geographic region of Kinder.

After reviewing the evidence, we find no error in this finding. The labor market survey was, by Younger's own admission, hypothetical in nature and contained positions that Dr. Mayes described as being beyond Odom's capabilities. All of these positions required physical dexterity in the use of her hands and interaction with the public. Based on Dr. Mayes' testimony, Odom has very limited use of her right arm and hand and would be incapable of using this, her dominant hand, to perform the

21

described functions. She also has speech difficulty, so interacting with the public would be very difficult for her. Moreover, all of the positions listed were located in Lake Charles. We agree with the workers' compensation judge that this is outside of Odom's reasonable geographic area, as she requires a driver to go anywhere beyond Kinder or Eunice, especially if she is required to drive on the interstate. Based on the foregoing, the judgment of the workers' compensation judge finding that Kinder Nursing Home provided Odom with insufficient vocational rehabilitation services is affirmed. This assignment of error is dismissed as being without merit.

## PENALTIES AND ATTORNEY'S FEES

In its next assignments of error, Kinder Nursing Home argues that the workers' compensation judge erred in awarding Odom penalties and attorney's fees. The workers' compensation judge held that Kinder Nursing Home failed to reasonably controvert her claim prior to reducing her weekly indemnity benefits and that it failed to properly investigate her requests for various medical therapies and handicap bars prior to denying them. As a result, she awarded Odom $4,000 in penalties and $12,000 in attorney's fees.

Dr. Mayes testified that Kinder Nursing Home's failure to approve testing early on prevented him from making a proper diagnosis in this matter. He stated that it was slow in responding and would not provide diagnostic testing until after its own consultants examined Odom and requested the same tests. Dr. Mayes said that although he requested a test of the brain to rule out neuropathy versus a stroke, the test was not authorized until Dr. Zuckerman requested it in 2001. He further said that he requested an EMG/nerve conduction study as early as 1998 and 2001, which was not

22

approved until Dr. Zuckerman requested it. This test was not performed until 2004. He testified that he has consistently requested psychological treatment for Odom, but that it was not approved by Kinder Nursing Home until after she was seen by Dr. Culver in 2001. He further stated that his requests for a utility cart, cervical pillow, and grab bars for her shower and hallway were never approved.

Vaughn admitted that she relied strictly on her own physicians' opinions in approving medical tests and in reducing Odom's benefits, even though she was aware that Drs. Culver and Zuckerman had each seen her only once. Although Dr. Clark was her choice of physiatrist, she testified that she refused to authorize the neuropsychological and occupational therapy evaluations and speech therapy recommended by him, even though he confirmed Dr. Mayes' findings on Odom. However, she approved a brain MRI and a neuropsychological evaluation after Dr. Zuckerman recommended them.

Vaughn stated that she did not approve any further treatment for Odom, even after Dr. Robertson recommended that she undergo aggressive psychiatric medical management and treatment for depression, cognizant behavior therapy, and speech therapy. She further admitted denying numerous requests from Odom's counsel for her to see physicians in various other specialities, and she denied Dr. Clark's request for handicap bars based on her determination that Odom had walked with a limp prior to the accident.

Vaughn testified that she reduced Odom's temporary total disability benefits to supplemental earnings benefits after Younger conducted a labor market survey based on Drs. Culver's and Zuckerman's opinions that Odom was at maximum

23

medical improvement. This reduction took effect on May 4, 2003. Vaughn further admitted that she reduced Odom's benefits even though she was unsure that Odom could actually perform the jobs identified in the survey.

An employer avoids the imposition of penalties and attorney's fees by satisfying its continuing obligation to investigate, assemble, and assess factual information prior to it denying benefits. *Wright v. Cypress Gen. Contractors, Inc.*, 05-700 (La.App. 3 Cir. 12/30/05), 918 So.2d 526, *writ denied*, 06-0238 (La. 4/24/06), 926 So.2d 553. Furthermore, the decision to award penalties and attorney's fees is factual in nature and will not be reversed on appeal absent manifest error. *Bigge v. The Lemoine Co.*, 04-1191 (La.App. 3 Cir. 3/2/05), 896 So.2d 269. Based on our review of the record and our finding that Odom is permanently and totally disabled, we find no error in these awards. The judgment awarding $4,000 in penalties and $12,000 in attorney's fees is affirmed.

### FRAUD

In its final assignment of error, Kinder Nursing Home argues that the workers' compensation judge erred in failing to find that Odom forfeited her right to workers' compensation benefits based on La.R.S. 23:1208 fraud. It bases its argument on the following facts: 1) that Odom sued for a motorized scooter which was not prescribed by Dr. Mayes; 2) that she lied in her deposition about previously being diagnosed with depression; and 3) that she lied about why she was unable to attend an examination by Dr. Culver.

In order for an employer to prove forfeiture pursuant to La.R.S. 23:1208, it must prove that a false representation was willfully made by the employee for the

24

purpose of obtaining compensation benefits. *Resweber v. Haroil Constr. Co.*, 94-2708, 94-3138 (La. 9/5/95), 660 So.2d 7; La.R.S. 23:1208(A). An inadvertent or inconsequential false statement does not result in the forfeiture of benefits. *Jim Walter Homes, Inc. v. Prine*, 01-116 (La.App. 1 Cir. 2/15/02), 808 So.2d 818.

Louisiana Code of Civil Procedure Article 1005 further provides that all affirmative defenses must be pled in a defendant's answer. The fraud provision found in La.R.S. 23:1208 is an affirmative defense; therefore, Kinder Nursing Home was required to plead this defense in its answer. However, it failed to do so. The first mention that it makes of fraud is in its post-trial brief to the workers' compensation judge.

In *Richey v. Vanliner Insurance Co.*, 97-121 (La.App. 3 Cir. 6/4/97), 696 So.2d 190, *writ denied*, 97-1799 (La. 10/13/97), 703 So.2d 620, we noted an exception to Article 1005 when the first knowledge of the alleged fraudulent statements occurred during cross-examination; thereby depriving the defendant of the right to seek relief pursuant to La.R.S. 23:1208. In that instance, we held that "we [would] not support claimant's fraud by technical applications of rules related to pleadings." *Id.* at 193. However, we find that the facts in *Richey* are clearly distinguishable, in part, from the facts present here.

The second and third statements that Kinder Nursing Home complains about were known by it for several years. These were not facts which first came to light during the trial on February 9, 2005. Kinder Nursing Home claims that Odom lied in her deposition when she testified that she had not taken any medication for depression prior to her fall. Although it failed to introduce Odom's deposition into the

record, Kinder Nursing Home obviously had this information prior to the trial.

Kinder Nursing Home further claims that she lied about the reason she could not attend a 2001 appointment. It had scheduled the appointment with Dr. Culver on June 28, 2001, but was informed by her counsel that her father had died and she would be unable to attend it. Vaughn testified that they normally scheduled appointments approximately a month and a half in advance of the actual appointment. When she was told that Odom would be unable to attend, she stated that she hired a private investigator, who learned that Odom's father actually died on May 19, 2001, and that she was in Mississippi with her daughter on June 28, 2001. As Kinder Nursing Home knew about Odom's alleged lie in June 2001, it cannot claim that it suddenly learned about her statements during the trial.

The third allegedly fraudulent statement concerning Odom's request for a motorized scooter presents the closest question. Dr. Mayes' records reveal that he received a telephone message from Odom's counsel on October 4, 2001. The message simply asks if she could have a prescription for a scooter. In his deposition, Dr. Mayes testified that he thought she may have asked for one, but, as far as he could recall, he did not feel that she needed it at the time. However, no mention of a request for a scooter is made in Odom's several disputed claims. During the trial on the merits, she testified that Dr. Mayes prescribed the scooter, but said that it was paid for by her daughter and son-in-law. Bogard simply testified that she was surprised to learn that Dr. Mayes never prescribed the scooter.

In reviewing this evidence pursuant to the manifest error standard of review, we find that the workers' compensation judge evidently decided that Odom's

statement about the scooter was not made willfully for the purpose of obtaining workers' compensation benefits. The fact that Odom never sought repayment for the scooter from Kinder Nursing Home would support this finding. Accordingly, we find no error in the workers' compensation judge's finding that Odom did not commit La.R.S. 23:1208 fraud as a result of her testimony concerning the scooter.

## ANSWER TO APPEAL

In her answer to the appeal, Odom requests that we award her additional attorney's fees for work performed in defense of Kinder Nursing Home's appeal. Based on our decision affirming the judgment in her favor, we award her an additional $5,000 in attorney's fees for work performed on appeal. *Cannon v. Hamilton Transp.*, 06-1302 (La.App. 3 Cir. 2/7/07), 948 So.2d 1250.

## CONCLUSION

For the foregoing reasons, the judgment of the workers' compensation judge is affirmed in all respects. Additional attorney's fees of $5,000 are awarded to Odom for work performed on appeal. The costs of this appeal are assessed to the defendant-appellant, Kinder Nursing Home.

**AFFIRMED.**