STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

07-395


WILLIE L. LOLLIS, JR.

VERSUS

SHAW GLOBAL ENERGY SERVICES

**********
APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 4
PARISH OF VERMILION, NO. 05-03229
SAM L. LOWERY, WORKERS' COMPENSATION JUDGE
**********

**GLENN B. GREMILLION**
**JUDGE**

**********

Court composed of Jimmie C. Peters, Glenn B. Gremillion, and J. David Painter, Judges.

AFFIRMED.

Louis M. Corne
1014 West University Ave.
Lafayette, LA 70506
(337) 264-1160
Counsel for Plaintiff/Appellee:
    Willie L. Lollis, Jr.

John J. Rabalais
Rabalais, Unlan & Lorio
5100 Village Walk, Suite #300
Covington, LA 70433
(985) 893-9900
Counsel for Defendant/Appellant:
    Shaw Global Energy Services

GREMILLION, Judge.

The defendant, Shaw Global Energy Services, appeals the decision of the workers' compensation judge finding the plaintiff, Willie Lee Lollis, Jr., disabled, entitled to indemnity benefits, and entitled to any necessary medical treatment or vocational rehabilitation services as a result of an occupational disease. We affirm.

**FACTS**

Lollis was employed as a paint mixer/sandblaster by Shaw at its Delcambre, Louisiana location. On November 7, 2004, while mixing Tideguard 171A Gray Resin, a spray-on epoxy cladding from Ameron Coatings, Lollis noticed a bitter taste in his mouth and then saw that he had Tideguard on his arms. He reported the incident to his supervisors after his arms became irritated. As a result of this contact, Lollis suffered headaches and developed rashes over his body. On January 14, 2005, he was diagnosed as suffering from an irritant dermatitis by Dr. Jennifer-Waguespack LaBiche, a dermatologist. Although Shaw restricted him from working in contact with Tideguard, Lollis quit work on February 13, 2005, because he claimed that the rash had spread to his eyes and affected his vision. A patch test performed by Dr. Waguespack-LaBiche revealed that Lollis was allergic to epoxy resin. Dr. William Nassetta, a specialist in occupational and environmental medicine, diagnosed him as suffering from an allergic contact dermatitis.

Lollis filed the instant disputed claim for compensation against Shaw seeking weekly indemnity benefits, medical treatment, and penalties and attorney's fees. Shaw denied all of Lollis' claims and further alleged that he forfeited his right to receive any benefits due to his fraudulent statements. Following a trial on the

1

merits, the workers' compensation judge denied Shaw's fraud claim and held that Lollis was disabled and entitled to weekly indemnity benefits retroactive to February 13, 2005, medical expenses and treatment, vocational rehabilitation services, and future supplemental earnings benefits if appropriate. The workers' compensation judge further awarded Lollis $2000 in penalties and $7500 in attorney's fees as a result of Shaw's failure to accommodate his work restrictions and its failure to provide him with vocational rehabilitation services. This appeal was perfected by Shaw.

## ISSUES

Shaw raises six assignments of error on appeal.

1.  That the workers' compensation judge erred in finding that Lollis suffered a compensable accident or occupational injury.

2.  That the workers' compensation judge erred in finding a causal connection between Lollis' alleged exposure to Tideguard and his alleged disability.

3.  That the workers' compensation judge erred in finding that Lollis proved his disability.

4.  That the workers' compensation judge erred in finding that Lollis was entitled to indemnity benefits and additional medical benefits.

5.  That the workers' compensation judge erred in finding that it failed to reasonably controvert Lollis' entitlement to benefits.

6.  That the workers' compensation judge erred in finding that Lollis did not forfeit his entitlement to indemnity benefits by making false statements for the purpose of receiving workers' compensation benefits.

2

## STANDARD OF REVIEW

The standard of review applied to factual findings in workers' compensation matters is the manifest error standard. This standard, which is based upon the reasonableness of the factual findings in light of the record reviewed in its entirety, is well established in our jurisprudence following the seminal cases of *Rosell v. ESCO*, 549 So.2d 840 (La.1989), and *Stobart v. State, through Department of Transportation and Development*, 617 So.2d 880 (La.1993).

As stated in *Bruno v. Harbert International Inc.*, 593 So.2d 357, 361 (La.1992):

> A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146 (La.1979); Malone and Johnson, *13 Louisiana Civil Law Treatise, Workers' Compensation*, § 253 (2d Ed.1980). Corroboration of the worker's testimony may be provided by the testimony of fellow workers, spouses, or friends. Malone & Johnson, *supra*; *Nelson [v. Roadway Express, Inc.*, 588 So.2d 350 (La.1991)]. Corroboration may also be provided by medical evidence. *West, supra*.

## OCCUPATIONAL INJURY

In its first three assignments of error, Shaw argues that the workers' compensation judge erred in finding that Lollis suffered an occupational injury as a result of his exposure to Tideguard and that he satisfied his burden of proof with regard to disability.

An employee suffering from an occupational disease receives the same workers' compensation benefits as an employee who has suffered an injury by accident arising out of and in the course of his employment. La.R.S. 23:1031.1(A).

3

An occupational disease is defined as "that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease." La.R.S. 23:1031.1(B). However, it does not include carpal tunnel syndrome, degenerative disc disease, spinal stenosis, arthritis, mental illness, or heart-related or perivascular disease. *Id.*

In order to recover medical and compensation benefits as the result of an occupational disease, Lollis must prove that he became allergic to epoxy resins as a result of the nature of his duties as a sandblaster/painter. *Dunaway v. Lakeview Reg'l Med. Ctr.*, 02-2313 (La.App. 1 Cir. 8/6/03), 859 So.2d 131. Lollis' burden is to prove a connection between his condition and his work-related duties by a reasonable probability. *Id.* Proof of only a possible relationship between the two does not satisfy this burden. *Id.*

In order to receive temporary total disability benefits, an employee must prove that he is unable to physically engage in any employment or self-employment as a result of his work-related injury. La.R.S. 23:1221(1)(c). The employee's burden of proof is by clear and convincing evidence; thus, Lollis must prove that his disability is highly probable or much more probable than not. *Carrier v. Debarge's Coll. Junction*, 95-18 (La.App. 3 Cir. 9/27/95), 673 So.2d 1043, *writ denied*, 96-0472 (La. 4/8/96), 671 So.2d 337.

Lollis testified that Shaw began using Tideguard in October 2004, at the request of a customer. He stated that he mixed this coating for approximately three weeks without any problems. However, on November 7, 2004, he stated that he

4

noticed a strong bitter taste in his mouth and that the skin on his arms was irritated. When he removed his rubber gloves, he said that he noticed Tideguard on his arms and that his gloves were imprinted on his arms. He said that he washed his arms and then reported the incident to David Smith, his supervisor.

That night, Lollis testified that he began shivering as though suffering from a fever. The next day, he called Smith and told him that his head was hurting badly and that his arms were irritated. He stated that Smith told him to take care of himself. Lollis returned to work on November 9, 2007, but was taken by David Cravey, Shaw's safety officer, to MedXcel Occupational Medicine Center because his arms and hands were swollen. He stated that he was examined by James Carruth, a physicians assistant, who injected him with a steroid and released him to work.

Lollis testified that Smith removed him from sandblasting/painting and had him driving a forklift in Shaw's yard, in an effort to distance him from the Tideguard. Despite this precaution, he stated that he was exposed to overspray and that his rash spread to his chest and his genitals. He stated that he was seen by Dr. Waguespack-LaBiche, who prescribed two creams for his rash. Although the creams worked, Lollis testified that the rash continued spreading to his forehead and below his eyes. At that point, he stated that he was having trouble with his vision so he went to the University Medical Center in Lafayette. There, he stated that he was given drops for his eyes and was advised by his doctor not to return to his position with Shaw. Lollis testified that he informed Smith of this and was further advised by him not to return to work.

5

Lollis continued working for Shaw through February 13, 2005. He testified that he stopped working at that time because his headaches were worse and his chest was hurting. He said that he was taken by his father to Our Lady of Lourdes Hospital in Lafayette. Lollis testified that tests run on his heart were negative and that he was given cream for his itching. However, neither the records from Our Lady of Lourdes or University Medical Center were introduced into evidence. Lollis stated that he was later examined by Dr. Nassetta, who recommended that he undergo a patch test. He returned to Dr. Waguespack-LaBiche, who determined that he was allergic to epoxy resins.

Lollis testified that his symptoms have continued. He stated that he experiences problems with headaches, rashes, stomach sickness, and muscle weakness when exposed to epoxy resins. He said he never experienced any of these symptoms prior to November 7, 2004. He stated that when he touches anything made of foam or plastic he starts itching. He said that he carries a pair of cotton gloves with him, which he uses anytime he touches something made of plastic, such as the steering wheel, phone, cellular phone, or remote control. He stated that he developed a rash on his stomach when the antenna from his cellular phone touched his skin.

At the time of the incident, Lollis testified that he was wearing his full personal protective gear, consisting of a double chamber respirator, rubber gloves, safety goggles, and coveralls. However, he stated that he was wearing the same gloves and coveralls from the previous day. He stated that when he first started mixing Tideguard, he was only required to wear goggles. As they learned more about the coating, he said that Shaw increased the amount of protective equipment they

6

were required to wear. Lollis further indicated that he had gotten Tideguard on his skin prior to the November 7, 2007 incident, but experienced no problems.

Lollis' father, Willie Lollis, Sr., testified that his son was in good health prior to the November 7th incident, but afterwards, he exhibited a rash on his arms and his eyes. At a later date, he said that Lollis suffered a high fever along with his rash, and that he had to rush him to the hospital. He stated that Lollis' eyes were so swollen that they were barely open. Lollis, Sr. further testified that Lollis' condition worsened after he stopped working for Shaw and that it was some time before his rashes disappeared. Now, he said that Lollis experiences a reaction every time he touches a Styrofoam cup.

Lollis's wife, Bernice, testified that he did not experience rashes prior to November 7, 2004, nor any other type of health problems. After November 7, 2004, she stated that Lollis exhibited rashes on his face, arm, leg, and chest, which itched all the time. She stated that his rashes became worse after he switched to the forklift and continued after he stopped working. She stated that he still experiences rashes; she said that he had black spots on the side of his face and hands, which itched all the time.

Smith, a paint superintendent for Shaw, testified that Lollis mixed the majority of the paints used on the different offshore structures Shaw painted. He stated that any personnel who paints is required to wear personal protection equipment consisting of long sleeves, a respirator, a paint stocking to cover their head and neck, and safety glasses/goggles. Additionally, he said that any employee who mixes paint wears a large apron. He further stated that all employees attended daily

safety meetings, where they sign a job safety analysis sheet.

Smith testified that Shaw began using Tideguard approximately two weeks prior to Lollis' complaint. He further surmised that Lollis mixed fifty to sixty gallons of the substance per day. However, he stated that Lollis was not the only employee mixing paint during that time period.

On November 7, 2004, Smith stated that both he and Lollis completed a report pertaining to the complained of incident. A couple of days later, he stated that Lollis reported that he had developed a rash as a result of the incident. He said that they went to Cravey's office and told him about Lollis' rash, after which Cravey took Lollis to the doctor. Smith testified that he recalled Lollis stating that he was not sure what caused the rash, and that they were still unsure of its cause. He further remembered that the rash started on Lollis' right hand and then spread to other areas of his body.

As a precautionary measure, Smith testified that he moved Lollis to the forklift-driver position in order to get him as far away from the Tideguard as possible. He stated that they gave him all new work clothes and tried to ensure that he worked downwind of any sandblasting or painting. He said that if he could not do so, Lollis stayed in his office.

Smith stated that Lollis' rash was bad at first, but that it became worse and spread a week later. However, he thought that it was better toward the end of February 2005. During that time, he stated that Lollis continued working full time. On February 13, 2005, Smith said that Lollis complained that Shaw was not doing anything for him and that he was going to see a doctor. Smith testified that he asked

what Shaw was supposed to do when Lollis reported to Cravey that he was fine. He then asked Lollis to talk to Cravey, but said that Lollis left work and has not returned. But for this, he testified that Lollis would still be employed by Shaw at a rate of eighteen dollars per hour.

Smith testified that Lollis has never been restricted from working regular duty by any doctor, nor did he observe him experiencing any difficulty while driving the forklift. He further stated that Lollis never complained about overspray in the yard or that he was hampered in his job duties by the presence of epoxy chemicals. Although Smith admitted that overspray does occur and that epoxy paint possibly was present in the air during sandblasting, he stated that Shaw tries to limit the amount by painting everything in a large shop. He disagreed that the overspray was bad as Shaw's yard covered twelve to fourteen acres. Furthermore, he stated that if it were bad, Shaw would have required all workers to wear respirators. Finally, he stated that Lollis never complained to him about being unable to work. Had he done so, he stated that he would have moved him to a position in the tool room until he was capable of returning to his regular duties.

Following this incident, Smith testified that they started requiring all painters to use chemical resistant rubber gloves. Previously, he stated that they only used heavy cotton-type gloves. He further stated that they required the painters to use a new pair every time they removed their gloves.

Carruth, the physician's assistant, testified that he initially saw Lollis on November 9, 2004, at which time he had a rash on his right forearm and on each side of his neck. He stated that he diagnosed this as a chemical dermatitis of unknown

9

etiology. He said that he told Lollis to avoid all chemicals until his condition resolved. Carruth testified that Lollis returned to him on November 27, 2004, after he experienced small eruptions on both arms. He again diagnosed this as a chemical dermatitis and set up an appointment for Lollis to see Dr. Waguespack-LaBiche. Lollis again complained of a rash and itching on January 3, 2005, which he diagnosed as a dermatitis of unknown etiology.

Dr. Waguespack-LaBiche testified that she diagnosed Lollis as suffering from an irritant dermatitis, which she described as a reaction of the skin to some type of irritant, such as a chemical or other substance. On January 14, 2005, she stated that he exhibited hyper-pigmented lichenified plaques on his chest and the sides of his neck, which appeared to be excoriated or scratched. She described these as being raised darkly colored thickened areas on the skin, which caused by chronic rubbing and scratching. She stated that he also complained of a rash in his groin, which she diagnosed as jock itch or tinea cruris.

Dr. Waguespack-LaBiche stated that Lollis returned as an independent patient on May 2, 2006, and requested a patch test to determine whether he was allergic to rubber. She testified that the test revealed that he was allergic to epoxy resins. She explained that a person may be predisposed at birth to becoming synthesized to an allergen; however, a person becomes allergic to a specific allergen when they are exposed to and become synthesized to a specific allergen. She said that an allergy does not occur after one contact, rather, it develops over a period of time after sufficient T-cells or immune response cells develop and act against the allergen.

10

Dr. Waguespack-LaBiche testified that although dermatitis can be disabling, Lollis was not disabled on May 2, 2006. She explained that she told him to avoid epoxy resins, which are contained in some vinyls and can be absorbed through rubber gloves. She stated that Lollis' allergy to this substance would be life-long and that he should not continue sandblasting or painting if epoxy resins were involved. She further testified that Tideguard does contain epoxy resins.

Dr. Nassetta diagnosed Lollis as suffering from an allergic contact dermatitis to epoxy resin. Of Lollis' symptoms, he stated that his headache during the acute setting was likely an irritant effect of the chemicals that compose the epoxy resin. However, he found no relationship between Lollis' symptoms in July 2005, and his employment with Shaw. Although Dr. Nassetta opined that it may have taken Lollis several weeks to become sensitized to epoxy resins, he said that once sensitized, his reactions could result from a lower concentration of the substance and from the presence of the substance in the air. He added that patients can develop an exquisite sensitivity to their particular chemical allergen; and he indicated that Lollis was extremely sensitive to some substance.

In July 2005, Dr. Nassetta noted that Lollis' rashes were in different locations from his initial reaction. This, he said, was common. He further stated that if Lollis was removed from an environment containing epoxy resins, he should improve in a matter of weeks or months. Dr. Nassetta also explained that Lollis could have developed cross reactions after the initial reaction and that skin tests were required to pin down his specific allergy. He stated that the skin tests performed by Dr. Waguespack-LaBiche revealed that Lollis was allergic to epoxy resins, a well

11

known chemical sensitizer. This, he said, was consistent with contact dermatitis and supported his diagnosis.

Dr. Nassetta testified that he could not make a disability determination for Lollis based on the information he possessed. In order to do so, he stated that he needed a definitive list of substances Lollis was allergic to, including cross reactions, and an analysis of Shaw's yard to determine whether those substances were present. He testified that the analysis would involve meeting with Shaw's environmental and safety people and its hygienist in order to evaluate Lollis' work environment. If epoxy resins were present throughout Shaw's yard and if Lollis was reacting to them, whether he continued working there would depend on the effect his reactions had on his health. If Lollis' symptoms were treatable and nothing more than a nuisance, then Dr. Nassetta felt that he could continue working. If they were worse, then it would depend on the degree of his symptoms and the side effects from his medications as to whether he continued working. As Lollis was able to work through February 2005, Dr. Nassetta opined that he probably could continue working for Shaw, leaving aside the unrelated symptoms. However, he stated that Lollis would probably not be able to paint or sandblast epoxy resins or other substances in the same class. He said that allergy shots were a possibility for Lollis.

In rendering his oral reasons, the workers' compensation judge held that Lollis satisfied his burden of proving that he suffered an occupational disease as a result of his exposure to Tideguard and that based on his testimony, he proved that he was temporarily totally disabled. In finding Lollis disabled, the workers' compensation judge stated:

12

Dr. Nassetta an acknowledged expert in work place (sic) – environmental medicine opined that any job that Mr. Lollis gets from now on will require a screening of some sort to determine if there are any "cross reacting" agents, which will exacerbate his condition. This strikes me as placing some very severe limits and restrictions on the employment prospects of the man who had been a laborer all his adult life. He cannot touch plastic or rubber or any other epoxy derived material. The employer testified that it was willing to allow Mr. Lollis to work in areas of the facility where he would be isolated from Tideguard paint spray, but evidence forces a conclusion this would be exceedingly difficult if not impossible to do. The company simply sort of assumed that there are places on the yard that are immune from Tideguard spray residue. There was nothing like an examination of the area as suggested by Dr. Nassetta. I don't know what a vocational rehabilitation expert might recommend because the company has not sent Mr. Lollis to see one.

Mr. Lollis (sic)on the stand for a long time and while he was on the stand for a long while (sic), and while he is not articulate he did appear at all times to be giving an honest effort in answering the questions posed to him. He came across as a thoroughly defeated person who had (sic) utterly perplexed and confused by the rapid and unexpected deterioration in this (sic) health and prospects. The Court finds that Mr. Lollis' allergy condition is the result of his accidental expose (sic) to the chemical Tideguard. His medical situation is such that he cannot find a job even for minimum wage. He is disabled. He is therefore entitled to workers' compensation indemnity benefits using Thirteen Dollars an hour for his annual weekly wage computation, retroactive to his last date of employment. The company will provide necessary medical treatment as well as vocation rehabilitation services as well (sic). If SEB is appropriate in due course then that will be ordered.

In reviewing the record in its entirety, we find no manifest error in the workers' compensation judge's finding that Lollis proved he suffered an occupational disease due to his exposure to Tideguard. His duties required him to mix coatings, including Tideguard for approximately two to three weeks. Both Drs. Waguespack-LaBiche and Nassetta diagnosed him as suffering from an allergic contact dermatitis to epoxy resins, a known sensitizer and component of Tideguard. As such substance was present in Lollis' work environment, Dr. Waguespack-LaBiche felt that it was

probably the cause of his contact dermatitis, whereas Dr. Nassetta opined that Tideguard was the cause of his initial reaction. Accordingly, we find that Lollis proved he suffered an occupational disease as a result of his contact with Tideguard.

However, the workers' compensation judge's award of temporary total disability poses the most vexed question on appeal. Dr. Waguespack LaBiche said that Lollis was not disabled from his contact dermatitis as of May 2, 2006, although she admitted that the condition could be disabling. In addition to giving Lollis a list of substances to avoid, she told him to avoid exposure to epoxy resins at work. Dr. Nassetta, the expert in occupational medicine, refused to render a disability determination for Lollis without more information pertaining to his specific allergies, possible cross reactions, and his work environment. In the absence of a more definitive disability determination, we find no manifest error in the workers' compensation judge's finding that Lollis proved he was temporarily and totally disabled. Accordingly, the judgment of the workers' compensation judge finding that Lollis suffered an occupational disease and was temporarily totally disabled as of February 13, 2006, is affirmed.

We further find no error in the workers' compensation judge's award of additional medical treatment to Lollis. Dr. Waguespack said that Lollis' allergy would continue for the rest of his life. Dr. Nassetta further indicated that Lollis would require medicine if he continued experiencing reactions. Furthermore, he stated that Lollis could possibly receive allergy shots.

## PENALTIES AND ATTORNEY'S FEES

In its next assignment of error, Shaw argues that the workers'

compensation judge erred in finding that it failed to reasonably controvert Lollis' entitlement to benefits for its failure to provide him with vocational rehabilitation services. Shaw based its argument on the fact that it offered Lollis the modified position as a forklift driver after the complained of incident. As this position was available to Lollis, Shaw argues that vocational rehabilitation services were not required.

We disagree. Both Drs. Waguespack-LaBiche and Nassetta restricted Lollis from working where epoxy resins were present. Dr. Waguespack-LaBiche said that he should not handle any epoxy resins and that those substances can penetrate shirts and rubber gloves. Dr. Nassetta said that Lollis would have no work restrictions if he was isolated totally from anything containing Tideguard or epoxy resins. He further stated that epoxy resins can become airborne. Without knowing Lollis' specific allergies, i.e., epoxy resins and any other cross reactions that have developed as a result of this allergy, we do not agree with Shaw's assumption that the forklift position alleviated the need for vocational rehabilitation services.

The medical evidence bears out that Lollis continued suffering rashes even after he was moved to the forklift driver position and away from the Tideguard. Moreover, Smith admitted that overspray occurred, that sandblasted epoxy paint was possibly present in the air, and that he could not ensure that Lollis was kept downwind of all painting or sandblasting which occurred in Shaw's yard, even if the yard was approximately fourteen acres large.

The workers' compensation judge's decision to award penalties and attorney's fees is factual in nature and will not be reversed on appeal absent manifest

15

error. *Odom v. Kinder Nursing Home,* 06-1442 (La.App. 3 Cir. 4/25/07), 956 So.2d 128. Based on the foregoing, we affirm the judgment of the workers' compensation judge awarding Lollis $2000 in penalties and $7500 in attorney's fees for Shaw's failure to provide him with vocational rehabilitation services.

## FRAUD

In its final assignment of error, Shaw argues that the workers' compensation judge erred in failing to find that Lollis violated La.R.S. 23:1208, by making false statements for the purpose of obtaining workers' compensation benefits. After reviewing the record and the testimony pointed out by Shaw, we find no manifest error in the workers' compensation judge's finding.

## CONCLUSION

For the foregoing reasons, the judgment of the workers' compensation judge is affirmed in all respects. The costs of this appeal are assessed to the defendant-appellant, Shaw Global Energy Services.

**AFFIRMED.**