# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## WCA 08-899


**KATHRYN FLOYD**

**VERSUS**

**LA. DEPT. OF PUBLIC SAFETY**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 2
PARISH OF RAPIDES, NO. 04-05784
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*


**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*


Court composed of Marc T. Amy, Michael G. Sullivan, and Shannon J. Gremillion, Judges.

**AFFIRMED.**


**Mark Terrance Hoychick**
**Hoychick & Aguillard**
**P. O. Drawer 391**
**Eunice, LA 70535-0391**
**(337) 457-9331**
**Counsel for Plaintiff/Appellant:**
**Kathryn Floyd**

**Leanne Broussard**
**State of Louisiana**
**P. O. Box 1710**
**Alexandria, LA 71309**
**(318) 487-5944**
**Counsel for Defendant/Appellee:**
**La. Dept. of Public Safety**

**GREMILLION, Judge.**

The plaintiff, Kathryn Floyd, appeals the judgment of the workers' compensation judge denying her total and permanent disability benefits. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Floyd was employed as a motor vehicle officer with the Louisiana Department of Public Safety beginning in June 1991. Her job of issuing drivers' licenses entailed testing and photographing applicants. Floyd claims that the photo processing chemicals leaked on a regular basis and that she was not provided any protective clothing to wear when working with them. In 1994, the office was treated for a cockroach infestation. The commercial pesticide company first sprayed when all of the employees were out of the office. However, Floyd claims that the second application was done when she was present. Shortly thereafter, Floyd alleges that she began experiencing pain in her upper extremities and began to see various physicians, some of her own choosing and others chosen by the State. Floyd began receiving benefits for carpal tunnel syndrome. Floyd was ultimately diagnosed with fibromyalgia and multiple chemical sensitivity (MCS).

Beginning in February 1995, Floyd received $238.94 per week in temporary total indemnity benefits. The temporary total indemnity benefits were terminated by the State on January 30, 2005.

In August 2004, Floyd filed a disputed claim for compensation claiming that she was suffering from an illness with flu-like symptoms with pain progressing to the neck, shoulders, arms, and later, all of her extremities and her spine. In January 2005, Floyd amended her claim requesting total and permanent disability status.

1

Following a trial in September 2007, the workers' compensation judge issued a judgment in February 2008, denying an award of benefits for total and permanent disability, various other claims for treatment, penalties for failure to approve treatment and for discontinuance of indemnity benefits, and attorney's fees. Floyd now appeals.

## ISSUES

Floyd assigns as error:

1.   The trial court committed manifest error in its interpretation of the medical evidence.

2.   The trial court committed legal error in failing to apply the presumption of causation.

3.   The trial court committed legal error in failing to give the proper weight to her unrebutted testimony.

4.   The trial court erred in finding that the State acted in good faith in its refusals to provide the several medical referrals made by physicians that both she and the State chose.

5.   The trial court erred in finding that the State acted in good faith in discontinuing her indemnify benefits, and

6.   The trial court committed legal error in failing to award penalties and attorney's fees in her favor.

## STANDARD OF REVIEW

In a workers' compensation case, the appellate court's review of factual findings is governed by the manifest error or clearly wrong standard. Thus, we will not set aside a workers' compensation judge's factual findings if they are reasonable in light of the record reviewed in its entirety. *See Lollis v. Shaw Global Energy Servs.*, 07-395 (La.App. 3 Cir. 10/3/07), 966 So.2d 1118; *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

2

**OCCUPATIONAL DISEASE**

An employee claiming an occupational disease is entitled to the same benefits in workers' compensation as she would be if she had suffered personal injury by accident. La.R.S. 23:1031.1(A). An occupational disease is defined as "only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease." La.R.S. 23:1031.1(B).

In order to recover benefits as the result of an occupational disease, Floyd must prove she developed fibromyalgia and MCS as a result of her employment with the Louisiana Department of Public Safety. *See Lollis*, 966 So.2d 1118. She must show a connection between her condition and her work-related duties by a reasonable probability. *Id. See also Williams v. Saint Gobain Containers,* 39,313 (La.App. 2 Cir. 1/26/05), 893 So.2d 144. Proof of the possibility of a relationship between the two does not satisfy this burden. *Id.* Additionally, whether Floyd has proved the existence of a disabling occupational disease is a question of fact subject to the manifest error/clearly wrong standard of review. Having reviewed the evidence we find no error in the workers' compensation judge's finding that Floyd failed to carry her burden of proof that her fibromyalgia and MCS were caused by her workplace.

*Presumption of Causation*

The workers' compensation judge found that the presumption of causation does not apply in occupational disease cases, only accident cases. Floyd argues that the presumption of causation has been applied in fibromyalgia cases and that she should have been given the benefit of the presumption. We disagree. In both

3

of the cases cited by Floyd, the employee left the workplace to seek treatment immediately or shortly thereafter. In *Theus. v. Schumpert Medical Center*, 25,750 (La.App. 2 Cir. 4/5/95), 653 So.2d 178, *writ denied,* 95-1442 (La. 9/22/95), 660 So.2d 475, the workers' compensation judge found that the plaintiff's fibromyalgia was caused by a sprained ankle which occurred at work. In *Winch v. Double M, Inc.*, 99-1793 (La.App. 3 Cir. 4/5/00), 764 So.2d 1055, *writ denied*, 00-1271 (La. 6/16/00), 765 So.2d 339, a roustabout experienced difficulty breathing, weakness, lightheadedness, and began to vomit blood while he was at work. His ensuing six-month long illness was found to have been caused by his workplace. In both of these cases, the workers' compensation judge found that events occurring at the workplace led to the resultant conditions. We find these cases to be inapplicable to the one at hand. Here, the workers' compensation judge specifically found that the tennis elbow condition, which undoubtedly arose at work, had no relation to the fibromyalgia and MCS as discussed further below. Accordingly, we find no error in the workers' compensation judge's refusal to apply a presumption of causation in favor of Floyd.

Floyd testified that the machine that created the drivers' licenses used five bottles of chemicals which were normally replaced every five weeks or so. She testified that on some occasions there would be one or two bottles that leaked all over the box and that she would have to retrieve replacement bottles from other boxes of chemicals. Floyd said that they always had three or four extra boxes of chemicals on hand at all times. She stated that the chemicals would get on her hands and that there was no place to wash her hands.

Floyd testified that beginning in 1991, she moved to a new building where she "cleared" licenses or handled issues involving DWIs, tickets, insurance

4

cancellations, and driving under suspension. She testified that the stress level at this job was extremely high because there were lines of people waiting to be seen everyday and they were unable to assist everyone. Floyd stated that the customers were always unhappy and constantly complaining and talking about the staff.

Floyd stated that the photographic chemicals were present right across the hall from her and that every time a new person started working they would develop twitches in their eyes. She further stated that people often quit due to the stress. She also discussed the cockroach infestation, stating that roaches were running up and down the walls and across the counters and desks. She further testified that there were rats running between people's legs. Floyd said that shortly thereafter, in late 1993 or early 1994, the commercial pesticide application was administered, first when no employees were present and the second time, while she was sitting at her desk. She described the spray treatment as extensive, including her desk drawers. Floyd stated they "saturated" the area.

Floyd stated that many people in the office began getting sick and that three other people were taken off work. She left work in 1995.

The medical records show that Floyd was initially treated for arm, hand, and elbow complaints by Drs. D.A. Waldman, an orthopedic surgeon, and Michael Genoff, a hand specialist, from 1994 to 1995. She was treated for carpal tunnel syndrome and tennis elbow. In October 1994, Dr. Waldman diagnosed her with mild right lateral epicondylitis (carpal tunnel), with postural strain secondary to working conditions. She was advised to procure furniture at her workplace made to prevent repetitive stress injuries associated with carpal tunnel syndrome.

Dr. Genoff evaluated Floyd in January 1995. He diagnosed her with

mild right lateral epicondylitis and minimal left lateral epicondylitis. He noted her disability status as continuing total temporary disability for a duration of two weeks. At a follow-up visit on January 25, 1995, Floyd was diagnosed with bilateral tennis elbow and early cervical degenerative joint disease. Dr. Genoff's report indicated that easily remedied conditions at work were contributing to her symptoms. He released Floyd to full duties with the caveat that the recommended modifications be made at work. A follow-up visit on February 13, 1995, indicated that Dr. Genoff assessed Floyd as having improved bilateral tennis elbow. By June 1995, Dr. Genoff released Floyd from his care having diagnosed her with tennis elbow.

Floyd began treating with Dr. L. Lazaro in March 1995, who treated her for arm and neck pain. He did not feel that surgical management of her symptoms was indicated at that time. An April 25, 1995 progress report indicates that Dr. Lazaro found that Floyd had improved and that her neck had improved "markedly." By May 1995, Floyd continued to complain of pain, but she refused injections of a local anesthetic and an anti-inflammatory.

In June 1995, Floyd met with Dr. C. Babson Fresh and indicated on an intake form that she was experiencing back, neck, leg, arm, shoulder, and hand pain. Dr. Fresh concluded that Floyd did not have clinical evidence of carpal tunnel syndrome, but had a probable soft tissue inflammatory condition of the right wrist.

In November 1995, Floyd saw Dr. Gregory Stewart. Floyd continued to complain of moderate chronic pain in both of her elbows that radiated into her shoulders. Dr. Stewart originally diagnosed her with bilateral epicondylitis. By March 1996, Dr. Stewart noted that Floyd's right elbow felt significantly better, but that she had some generalized pain. He noted that she was undergoing aquatherapy.

By June 1996, Dr. Stewart noted that Floyd possibly had fibromyalgia. Floyd reported that her symptoms had worsened, but that the aquatherapy had been very beneficial. Dr. Stewart indicated a significant number of restrictions and job site modifications that would be appropriate. However, he was also of the opinion that she would not be able to type for longer than three to five minutes at a time with a significant break of twenty to thirty minutes. By August 1996, Dr. Stewart noted fibromyalgia as his impression. Floyd indicated the onset of low back pain. By January 1997, Dr. Stewart indicated that Floyd should be able to begin work trials.

In June 1998, the State sent Floyd to see Dr. Gerald Leglue, whom she last saw in 2003. He diagnosed her with "fibromyalgia pain syndrome." He testified via deposition that it was possible that some exposure in her environment was causing her to have diffused pain syndrome. He stated that he could say that in good faith because he had seen more than one person come out of that particular office with similar problems. Dr. Leglue further stated that fibromyalgia can be related to isolated events, to cumulative trauma, or to exposure. Dr. Leglue continued the aquatherapy and recommended acupuncture. Dr. Leglue testified that Floyd seemed to receive the most benefit from the acupuncture.

In October 1999, it was recommended that a functional capacity examination (FCE) be conducted. However, Dr. Leglue was of the opinion that Floyd could not undertake an FCE due to the lifting, moving, twisting, and bending required of the test. He feared this would worsen her symptoms, and it was not conducted. Dr. Leglue testified that he saw Floyd three times in 2000, and that she was improving with acupuncture. That year, Dr. Leglue noted that Floyd complained that she was having problems with odors and smells. He stated that she was very

7

sensitive. By October 2001, Dr. Leglue stated that Floyd was stable with acupuncture treatment.

Following the last visit in October 2001, Dr. Leglue did not see Floyd again until July 2003, at which time she complained of neck and shoulder pain of a different sort than had previously bothered her. She also indicated inability to control her bowels on occasion. Dr. Leglue recommended an MRI at that point, but the State denied the testing. Dr. Leglue testified that the State had been helpful and amenable to the treatment he recommended for Floyd up until that point.

As of July 2003, Dr. Leglue diagnosed Floyd with fibromyalgia pain syndrome. He opined that based on Floyd's subjective history, the cause of her condition was more probably than not toxic exposure in the workplace, although he had no record of what the toxic substances were. Dr. Leglue further reported on a form to Kala Crowe, a state risk claims adjuster, that Floyd was capable physically of doing sedentary activities, but that he was not sure she could handle any job psychologically.

In January 2002, Floyd began treating with Dr. Jonathan Forrester, who continued to be her treating physician at the time of trial. Floyd complained of fibromyalgia and multiple chemical sensitivities. He stated that fibromyalgia is one of his specialities, but that he has no expertise in MCS. He further stated that he has no test available to confirm MCS. Dr. Forrester opined that most chemically sensitive patients are also allergy patients. He further stated that a person who has MCS does not necessarily have fibromyalgia and vice versa. But, he testified that there is no known cause for fibromyalgia; that it is a set of symptoms.

Dr. Forrester testified that, in general, allergies are genetic and are not

8

caused by environmental factors. He treated Floyd for allergies and stated that they were not work-related. However, he testified via deposition that, more probably than not, Floyd would be unable to return to work. He further testified that the cause of her fibromyalgia was employment-related based on the history she provided.

In 2005, after benefits had been terminated, Floyd testified that she went to see an expert in environmental exposure, Dr. Kaye Kilburn, in Pasadena, California at her own expense. Following an examination in February 2005, Dr. Kilburn diagnosed Floyd with chemical encephalopathy, airways obstruction, peripheral neuropathy, and intolerance (hyper-sensitivity) to many chemicals due to exposure to organophosphates, photo chemicals, cigarette smoke, and other chemicals. Dr. Kilburn found that Floyd required a protected environment to avoid many chemicals. Dr. Kilburn noted Floyd's exposure history as follows:

> During your period of employment you were frequently exposed to pesticide/insecticide spray from fellow employees and from professional agents. Your building was overrun with cockroaches. After one particular spray incident by a professional you arrived at work to see a dead dog and skunk near the building. You had a small office that was sometimes sprayed while you worked at your desk. You also developed instant driver's license photos and handled 5 different photo chemicals to do this. You performed in this job for 6 years. On one occasion one of the 5 bottles leaked and you inhaled the fumes. These were stored near your desk and you were never advised to wear protective equipment. An additional exposure was cigarette smoke from fellow workers. It was so thick as to look like a blue fog in your office. You complained to the State Fire Marshall after voicing your concern did not stop the indoor smoking.

Dr. William J. Nassetta had the opportunity to examine Floyd on July 12, 2006. Dr. Nassetta provided an extensive sixteen page report detailing Floyd's medical history and list of complaints. He provided laboratory results for a variety of tests including an allergen respiratory panel. He further discussed MCS stating (citations omitted):

Individuals who respond to varied exposures or odors, usually at levels less than would be expected to cause harm, in a variety of non-specific symptomatic ways without objective findings on physical exam or on laboratory evaluation have in the past been labeled as having "multiple chemical sensitivity." Recently, the term "idiopathic environmental intolerance" (IEI) has been suggested to replace multiple chemical sensitivity (MCS) and older terms that describe the same process. Idiopathic environmental illness is defined as an acquired disorder with multiple recurrent symptoms associated with diverse environmental factors tolerated by the majority of people and not explained by any known medical or psychiatric disorder.

Because MCS is controversial, many practitioners are now avoiding the more colorful names, and often refer to MCS as not as a condition *per se*, but as a symptom complex resulting from a primary diagnosis, such as organic brain dysfunction or toxic encephalopathy. All of this is on the list of Dr. Kilburn's "diagnoses."

In many ways, IEI is a belief system. Promoted by clinical ecologists and those sympathetic to their views, and followed by medically naive lay persons, the belief is reinforced by referring patients to a network of similarly minded clinicians, and establishing support groups, hotlines, journals, and clinics to support and reinforce these beliefs. Some have called this phenomenon a medical subculture.

Many experts have studied "MCS" patients and concluded that their basic problem is psychologic rather than physical. The best current data suggest that certain psychological factors predispose individuals to develop symptoms and to seek out someone who will provide a "physical" explanation of their symptoms, as Ms. Floyd did with Dr. Kilburn. Additionally, Ms. Floyd had been identified as being at strong risk for somatization, which certainly plays some part in her condition.

IEI is considered one of a multitude of so-called functional somatic syndromes. These syndromes are characterized more by symptoms, suffering and disability than by consistently demonstrable tissue abnormality.

Dr. Nassetta was asked if he agreed with the diagnosis of MCS and, if so, whether it was related to Floyd's work environment to which he responded:

No, I do not concur with the diagnosis of MCS. MCS is not recognized as a clinical syndrome by mainstream medical practitioners. Given that MCS is not even agreed to exist among mainstream medical practitioners, its "causes" would be speculative. Therefore, it is my professional opinion that Ms. Floyd does not have multiple chemical sensitivity and therefore, it could not be related to any exposure in her

work environment.

Dr. Nassetta was further asked about Floyd's fibromyalgia diagnosis to which he opined:

> Fibromyalgia, on the other hand, is an accepted medical diagnosis. However, as stated above, it is considered one of the overlap syndromes. The syndrome of fibromyalgia (FMS) has been defined as a constellation of complaints including diffuse chronic pain and the presence of tender points. The syndrome is often debilitating, frustrating physicians and patients alike. The frustration stems from the chronic nature of the symptoms, the multiplicity of possible etiologies, the vague boundaries of definitions, and the lack of treatments that reliably and completely treat the symptoms. Due to the non-specific and subjective nature of FMS, there has been controversy focusing on three primary issues: 1) whether fibromyalgia is a "garbage-bin" diagnosis for all unexplained complaints, 2) whether fibromyalgia is primarily a psychiatric disease, and 3) whether fibromyalgia is a non-disease of malingerers or hypochondriacs.

Dr. Nassetta went on to state that he had no reason to doubt the diagnosis of fibromyalgia. However, he stated, "there are no known, generally accepted causes of this condition, therefore I do not believe it to be directly related to her work environment." Dr. Nassetta summarized his opinion as follows:

> Kathryn Floyd is a woman who worked for the State of Louisiana for periods of time in the 1980's and 1990's who developed bilateral lateral epicondylitis. The development of this condition was most likely related to her work and the lack of an ergonomically designed workspace. Over time, however, as symptoms in her elbows improved, Ms. Floyd began to develop non-specific somewhat diffuse somatic complaints. She has been given diagnoses including multiple chemical sensitivity and fibromyalgia. Various practitioners have questioned the etiology of these conditions as being related to chemical exposures in the work place. It is important to highlight that at no time did Ms. Floyd describe adverse acute health effects to chemical exposures in the workplace, as would be expected in most cases of those who would proceed on to develop chronic problems. There seems to be some degree of recall bias in this case. That is, once a physician suggested that chemicals might have contributed to her problems, Ms. Floyd tried to recall any chemicals that she may have been exposed to in her employment. However, at no time did any practitioner consider the exact nature of the chemicals, their dose, or their potential for causing disease. Further, there was no mention of chemicals as a potential cause until some years

11

after her leaving work for the state and no visits to doctors for acute exposures to chemicals form her workplace. One must also consider the psychological contribution to Ms. Floyd's overlap syndrome. Specifically, Dr. Quillan's finding of Ms. Floyd being at strong risk for somatization. The common feature of somatoform disorders is the presence of physical symptoms that suggest a general medical condition (hence the term *somatoform*) and are not fully explained by a general medical condition, by the direct effects of a substance, or by another mental disorder. It would appear then that Ms. Floyd has somatization at the present time that is unrelated to any possible exposure in her workplace with the State of Louisiana.

Following the presentation of the evidence, the workers' compensation judge issued extensive detailed oral reasons for judgment that encompass thirty-one legal typed pages. Having reviewed all of the evidence, we find no manifest error in the workers' compensation judge's ruling that Floyd's workplace did not cause her fibromyalgia and MCS.

We find that it was reasonable for the workers' compensation judge to conclude that Floyd's employment with the State and her eventual diagnosis of fibromyalgia and MCS were not causally connected. Every doctor testified that there is no known cause of fibromyalgia or MCS. The workers' compensation judge found the first mention of fibromyalgia was more than two years following her leave from work.

Floyd strenuously argues that the fibromyalgia resulted from the original diagnosis of epicondylitis and that it should be presumed that her fibromyalgia resulted from this condition. We disagree. In his oral reasons for judgment, the workers' compensation judge specifically found:

If the indication is that the fibromyalgia was a result of the epicondylitis, we have introduced on Ms. Floyd's behalf proposed to the experts in fibromyalgia Dr. Leglue and Dr. Forrester. Dr. Leglue said in his opinion fibromyalgia – well, he didn't say fibromyalgia was a result of the symptomatic problems associated with epicondylitis. He felt like it was an–related to a toxic work environment. Dr. Forrester did

12

not say that the fibromyalgia was a result of any symptomatology associated with her epicondylitis. He said fibromyalgia was a result of stressors from multiple chemical sensitivity.

So both Dr. Forrester and Dr. Leglue destroyed any presumption that could be argued on Ms. Floyd's behalf with regard to fibromyalgia being certainly associated with epicondylitis.

We find no manifest error in these findings.

The workers' compensation judge went on to discuss Floyd's MCS. He noted that the first claim of chemical sensitivity from odors was in 2001, some six years after the alleged exposure and that Floyd was not diagnosed with MCS until February of 2005 by Dr. Kilburn. Dr. Nassetta testified that the majority of medical professionals do not even accept MCS as a legitimate medical condition. The testimony regarding the "exposure" was scant. Floyd testified and reported to Dr. Kilburn that one bottle of fluid used in making driver's licenses spilled. She testified to one event in which a bug spray treatment was conducted while she was in the office. There simply was insufficient evidence to suggest that these isolated events led to Floyd's fibromyalgia and MCS. Clearly, the workers' compensation judge found Dr. Nassetta's testimony more credible; a finding which was in his purview. Dr. Nassetta had the benefit of having all of Floyd's medical records for review whereas Dr. Kilburn did not review any medical records. Both doctors saw Floyd on only one occasion. Accordingly, assignments of error one through three are without merit.

**PERMANENT TOTAL DISABILITY**

Although we need not address this claim because we found no error in the workers' compensation judge's finding that causation was not proven, we note that the workers' compensation judge further found that, even accepting as true that

13

Floyd's fibromyalgia and MCS were caused by her workplace, she still failed to prove that she was totally and permanently disabled. We agree based on our review of the record. There was testimony that Floyd was capable of sedentary to light duty work. Accordingly, this assignment of error is without merit.

## PENALTIES AND ATTORNEY'S FEES

In these assignments of error Floyd argues that the State was not in good faith and was arbitrary and capricious in its refusal to approve and/or provide certain medical tests and treatment and that the State should pay penalties and attorney's fees for its refusals. We disagree. A workers' compensation judge's decision to award penalties and attorney's fees is factual in nature and will not be reversed on appeal absent manifest error. *Odom v. Kinder Nursing Home*, 06-1442 (La.App. 3 Cir. 4/25/07), 956 So.2d 128.

The State refused to pay for the following treatments/referrals:

1) Treatment at the Dallas Environmental Health Center and a referral to Dr. Donna Breen as recommended by Dr. Forrester for concerns about mold. We find no error in the workers' compensation judge's finding that this referral was not for a work-related illness.

2) Payment for Dr. Kilburn's services. Floyd visited Dr. Kilburn in California at her own expense following the termination of her benefits. Considering our foregoing findings, we find no error in the workers' compensation judge's finding that the State was not in bad faith in refusing to pay for this visit as it was not for a work-related illness.

3) Dr. Leglue's recommendation that Floyd undergo an MRI in regard to suspicion of a cervical disc injury. Again, we find no error in the workers'

14

compensation judge's finding that the State was in good faith in denying this claim as it had no relation to a work injury. Further, there were claims for unpaid bills owed to Dr. Leglue; however, no evidence was introduced regarding any unpaid bills.

4) Dr. Forrester's recommendation that Floyd be evaluated by Dr. Tom Calendar, an environmental specialist. Although Dr. Leglue testified that he discussed the possibility of a consultation with Dr. Calendar, no referral was actually made. Moreover, for the same reasons as above, the workers' compensation judge did not manifestly err in refusing to award penalties.

Additionally, considering the lengthy amount of time that Floyd was paid benefits for a tennis elbow condition, we certainly find no error in the State's termination of benefits after nearly ten years of payment.

Based on our foregoing findings, we find no error in the workers' compensation judge's refusal to award penalties or attorney's fees. Assignments of error four through six are without merit.

## CONCLUSION

The judgment of the workers' compensation judge in favor of the Louisiana Department of Public Safety terminating the benefits of Kathryn Floyd is affirmed. All costs of this appeal are assessed against Floyd.

**AFFIRMED.**

15